EDGEWOOD INDEPENDENT SCHOOL
DISTRICT et al., Alvarado Independent
School District et al., Guadalupe Gutier-
rez et al., Carrollton–Farmers Branch
Independent School District et al., Cop-
pell Independent School District et al.,
Sterling City Independent School Dis-
trict et al., Stafford Municipal School
District et al., Humble Independent
School District et al., and Somerset In-
dependent School District et al., Appel-
lants,

v.

Lionel R. MENO et al., and Bexar
County Education District et
al., Appellees.

No. 94–0152.

Supreme Court of Texas.

Argued May 25, 1994.

Decided Jan. 30, 1995.

As Modified Feb. 16, 1995.

Rehearing Overruled March 2, 1995.

Bracewell and Patterson, Kelly Frels, John David Thompson, III, Houston, Gray and Becker, Roger Moore and Richard E. Gray, III, Austin, Law Offices of Earl Luna, Robert E. Luna and Earl Luna, Dallas, Ray, Wood and Fine, Randall Buck Wood, Austin, Mexican American Legal Defense and Educational Fund, Antonia Hernandez, Albert H. Kauffman, Luis A. Wilmot and Carmen Rumbaut, Texas Justice Foundation, Allan E. Parker, San Antonio, Brown and Thompson, Andrew L. Wambsganss, Fort Worth, Olson and Olson, John F. Olson and William A. Olson, Houston, Thompson and Knight, Schuyler B. Marshall, G. Luke Ashley and Deborah G. Hankinson, Dallas, Foster, Lewis and Langley, Emerson Banack, Jr. and Kenneth L. Malone, San Antonio, Bickerstaff, Heath and Smiley, Sara Hardner Leon, C. Robert Heath, David Mendez and Steve Bickerstaff, Austin, Judith Sanders–Castro, San Antonio, META, INC., Roger Rice, Somerville, MA, for appellants.

Dan Morales, Atty. Gen., Toni Hunter, Asst. Atty. Gen., Raymond Bonilla, Jr., Comptroller's Office, Kevin T. O'Hanlon, Texas Educ. Agency, Austin, for appellees.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER and GAMMAGE, Justices, joined. HECHT, ENOCH and OWEN, Justices, joined in Parts I, II, III, V, VI and VII.

Six years ago, this Court held that this State's system for financing public education violated article VII, section 1 of the Texas Constitution. *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 397 (Tex.1989) (*Edgewood I* ). Today we consider whether the Legislature's latest efforts to reform the education finance system satisfy article VII, section 1, and other provisions of the Texas Constitution.

■ Following standard rules of constitutional interpretation, we begin with the presumption that Senate Bill 7 is constitutional; the burden of proof is on those parties challenging this presumption. *Spring Branch Indep. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 558 (Tex.1985). On final analysis, we conclude that all parties claiming that Senate Bill 7 is unconstitutional have failed to meet that challenge.[1] We accordingly affirm the constitutionality of the public school finance system enacted in Senate Bill 7. We emphasize, however, that the challenge to the school finance law based on inadequate provision for facilities fails only because of an evidentiary void. Our judgment in this case should not be interpreted as a signal that the school finance crisis in Texas has ended.

With the abiding conviction that it was "idle to expect the continuance of civil liberty, or the capacity of self-government" unless the people are educated and enlightened, the delegates of the Texas people declared their independence on March 2, 1836, at Washington–on–the–Brazos. Our first state constitution, adopted in connection with Texas' annexation to the United States in 1845, provided:

> A general diffusion of knowledge being essential to the preservation of the rights and liberties of the people, it shall be the duty of the Legislature of this State to make suitable provisions for the support and maintenance of public schools.

The present requirement, that public schools be part of "an efficient system," was added to our Constitution in 1876, and has been the focus of litigation in Texas courts since 1984.

Plainly, it is the Legislature's duty to make suitable provision for an efficient system of

---

1. Notwithstanding our other differences, eight justices agree that, under this record, the Legislature has satisfied its duty to provide an efficient system of public schools under art. VII, § 1 of the Texas Constitution.

public education in Texas. Given the prominence of this concern throughout Texas history, there can be no dispute that education of our children is an essential Texas value. An efficient system of public education requires not only classroom instruction, but also the classrooms where that instruction is to take place. These components of an efficient system—instruction and facilities—are inseparable.

Yet sadly, the existence of more than 1000 independent school districts in Texas, each with duplicative administrative bureaucracies, combined with widely varying tax bases and an excessive reliance on local property taxes, has resulted in a state of affairs that can only charitably be called a "system." For too long, the Legislature's response to its constitutional duty to provide for an efficient system has been little more than crisis management. The rationality behind such a complex and unwieldy system is not obvious. We conclude that the system becomes minimally acceptable only when viewed through the prism of history. Surely Texas can and must do better.

■ We do not presume that the framers and ratifiers of the Texas Constitution have given the Legislature an impossible task, nor do we presume that they so limited the Legislature's discretion in discharging this duty that all but one or two options are foreclosed. The Legislature's discretion should be tethered only by the limits that the people have dictated in the Constitution they have adopted for themselves, and for their representatives.

■ This Court's role under our Constitution's separation of powers provision should be one of restraint. We do not dictate to the Legislature how to discharge its duty. As prominent as this Court's role has been in recent years on this important issue, it is subsidiary to the constitutionally conferred role of the Legislature. The people of Texas have themselves set the standard for their schools. Our responsibility is to decide whether that standard has been satisfied, not to judge the wisdom of the policy choices of the Legislature, or to impose a different policy of our own choosing.

I

This litigation has a long history. In May 1984, numerous school districts sought a judicial declaration that the public school finance system violated the Texas Constitution. After a trial, the district court ruled that the existing system was unconstitutional in several respects, and enjoined the State from funding it unless the violations were corrected by a certain date. The court of appeals reversed that judgment, 761 S.W.2d 859 (Tex.App.—Austin 1988); but this Court reversed the court of appeals' judgment, holding that the school finance system was not "efficient" as required by article VII, section 1 of the Texas Constitution. *Edgewood I*, 777 S.W.2d at 397. We thus affirmed the district court's judgment, modifying it only to postpone the effective date of the injunction. *Id.* at 399.

The Legislature responded by passing Senate Bill 1 in June 1990. The school districts renewed their challenges in the district court, which held that the school finance system remained unconstitutional. On direct appeal, we also held that the system remained inefficient, noting the "overall failure to restructure the system." *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 496 (Tex.1991) (*Edgewood II*). We therefore directed the district court to reinstate its original injunction, but again postponed the effective date to give the Legislature time to respond. *Id.* at 498–99.

The Legislature then passed Senate Bill 351, which created 188 county education districts (CEDs) to carry out taxing functions. Numerous school districts and individuals challenged the constitutionality of the new finance structures. This Court sustained two of those challenges, holding that Senate Bill 351 levied a state ad valorem tax in violation of article VIII, section 1–e of the Texas Constitution, and that it levied an ad valorem tax without an election in violation of article VII, section 3 of the Texas Constitution. *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 524 (Tex.1992) (*Edgewood III*). Once again, we directed the district court to reissue its injunction, as modified to give the

Legislature time to act. *Id.* at 523 & n. 42, 524.

The Legislature's first response to *Edgewood III* was to propose a constitutional amendment that would have authorized the creation of CEDs with limited authority to levy, collect, and distribute ad valorem taxes. *See* Tex.S.J.Res. 7, 73rd Leg., R.S., 1993 Tex.Gen. Laws 5560. When the voters rejected that measure, the Legislature passed Senate Bill 7.[2]

Senate Bill 7 was immediately challenged by numerous groups of plaintiffs, representing hundreds of school districts, both property-rich and property-poor, as well as many parents and local officials. After a trial on the consolidated actions, the district court held that Senate Bill 7 was constitutional, but found that the Legislature had failed to provide efficiently for facilities. The district court accordingly denied most of the relief sought by the plaintiffs, but ordered that no bonds for any school district could be approved, registered, or guaranteed after September 1, 1995, unless the Legislature had provided for the efficient funding of educational facilities by that time.

Nine groups of plaintiffs and plaintiff-intervenors perfected direct appeals. The State also perfected its own appeal. We noted probable jurisdiction of all ten appeals.

For purposes of discussion, the present challenges are organized according to the parties bringing them. Two groups of appellants are composed mainly of property-poor school districts, whose complaints focus on the efficiency of Senate Bill 7.[3] Five groups of appellants are composed largely of property-rich school districts; their complaints focus primarily on the revenue system of Senate Bill 7.[4] The State complains of the district court's ruling on facilities. The Guadalupe Gutierrez group of appellants complains of the district court's dismissal of its cause of action. Finally, the Somerset Independent School District group of appellants brings complaints relating to the distribution of excess CED funds. Before considering these challenges, we present an overview of Senate Bill 7.

II

Like the systems reviewed in our previous opinions, Senate Bill 7 provides a two-tiered education finance structure known as the Foundation School Program. The stated purpose of Tier 1 is to guarantee "sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards." TEX. EDUC.CODE § 16.002(b). For each student in average daily attendance, a district is entitled to a basic allotment of $2,300, which is subject to various adjustments and special allotments to reflect variations in actual cost. TEX.EDUC.CODE § 16.101. To be eligible for the program, a district must raise its local share of funding, defined as the amount produced when an effective tax rate of $0.86 per $100 valuation is applied to the taxable value of property in the district for the prior tax year. TEX.EDUC.CODE § 16.252. To the extent that an $0.86 effective tax rate fails to produce the adjusted allotment from the district's own tax base, the State makes up the difference. TEX.EDUC.CODE § 16.254.

Tier 2 comprises a guaranteed yield system, the stated purpose of which is "to pro-

---

**2.** Act of May 28, 1993, 73rd Leg., R.S., ch. 347, 1993 Tex.Gen.Laws 1479.

**3.** These groups are: (1) Edgewood Independent School District et al., Plaintiffs, and (2) Alvarado Independent School District et al., Plaintiff–Intervenors.

**4.** These groups are: (1) Carrollton–Farmers Branch Independent School District et al., Plaintiff–Intervenors, (2) Coppell Independent School District et al., Plaintiff–Intervenors, (3) Sterling City Independent School District and Crockett County Consolidated Common School District, Plaintiff–Intervenors, (4) Stafford Municipal

School District and the City of Stafford, Plaintiff–Intervenors, and (5) Humble Independent School District et al., Plaintiff–Intervenors.

The Humble Independent School District group consists of 263 districts with a variety of demographic compositions. The Humble group asserts that it is more properly classified with the property-poor districts because two-thirds of its members are of below-average wealth. For the purpose of oral argument in this Court, the group was aligned with the property-poor school districts, but for purposes of this opinion, it is classified with the property-rich districts because its arguments focus primarily on the revenue system rather than on efficiency.

vide each school district with the opportunity to supplement the basic program at a level of its own choice and with access to additional funds for facilities." Tex.Educ.Code § 16.301.[5] For every cent of additional tax effort beyond the $0.86 required for Tier 1, the State guarantees a yield of $20.55 per weighted student.[6] Tex.Educ.Code § 16.302. To the extent that an additional cent of tax effort fails to yield that amount from the district's own tax base, the State makes up the difference. Tex.Educ.Code § 16.254. The yield guarantee applies only to $0.64 of tax effort beyond the $0.86 required for Tier 1, so no Tier 2 funds are provided for any effective tax rates exceeding $1.50. Tex. Educ.Code § 16.303.

While this two-tiered structure is, for the most part, carried forward from prior systems, Senate Bill 7 does contain a significant new feature: it imposes a cap on a school district's taxable property at a level of $280,000 per student. Tex.Educ.Code § 36.002. Every year, the Commissioner of Education must review the tax base per student of every school district in the state, and any district exceeding the $280,000 cap may elect one or more of the following actions to bring its taxable property within the cap:

(1) consolidation with another district;

(2) detachment of territory;

(3) purchase of average daily attendance credit;

(4) contracting for the education of non-resident students; or

(5) tax base consolidation with another district.

Tex.Educ.Code §§ 36.003, .004. Options 1 and 2 may be exercised by agreement between districts; options 3, 4, and 5 require voter approval. Tex.Educ.Code §§ 36.031, .061, .096, .122, .154.

If a district fails to successfully exercise one or more of the five options by a certain deadline, the Commissioner of Education must detach property from the district and annex it to another district. Tex.Educ.Code § 36.004(b). If the detachment will not sufficiently reduce the district's taxable property, the Commissioner must consolidate the district with one or more other districts. *Id.*

The $280,000 cap is not effective immediately. To mitigate the impact on the wealthiest districts, Senate Bill 7 provides for a three-year phase-in period during which districts are allowed to keep some property in excess of $280,000 per student. Tex.Educ. Code § 36.002. Specifically, the bill allows districts to retain as much property as is necessary to keep operations and maintenance revenues at the 1992–93 level at a tax rate of $1.375 in 1993–94 and $1.50 in 1994–95 and 1995–96. *Id.*

In addition to reforming the financing system, Senate Bill 7 makes significant educational reforms in Chapter 35 of the Texas Education Code, entitled "Public School System Accountability." In this Chapter, the Legislature defines the contours of its constitutional duty to provide a "general diffusion of knowledge" by articulating seven public education goals.[7] These goals emphasize ac-

---

5. *See also* Tex.Educ.Code § 16.002(b) ("The second tier provides a guaranteed yield system of financing to provide all school districts with substantially equal access to funds to provide an enriched program and additional funds for facilities.").

6. The Tier 2 allotment is based on a district's weighted students in average daily attendance (WADA). Based on the evidence at trial, a district's WADA roughly equals 1.3 times its average daily attendance.

7. The goals of public education are:
GOAL A: All students shall have access to an education of high quality that will prepare them to participate fully now and in the future in the social, economic, and educational opportunities available in Texas.

GOAL B: The achievement gap between educationally disadvantaged students and other populations will be closed. Through enhanced dropout prevention efforts, the graduation rate will be raised to 95 percent of students who enter the seventh grade.
GOAL C: The state shall demonstrate exemplary performance in comparison to national and international standards for student performance.
GOAL D: A well-balanced and appropriate curriculum will be provided to all students.
GOAL E: Qualified and effective personnel will be attracted and retained. Adequate and competitive compensation commensurate with responsibilities will be ensured. Qualified staff in critical shortage areas will be recruited, trained, and retained.

ademic achievement. Most notably, the Legislature envisions that all students will have access to a high quality education and that the achievement gap between property-rich and property-poor districts will be closed. The Legislature has established a system of student assessment and school district accreditation to measure each district's progress toward meeting these goals. Tex.Educ. Code §§ 35.021–.121. Districts that chronically fail to maintain accreditation standards are subject to penalties, including dissolution of the offending school district and its annexation to another district. Tex.Educ.Code §§ 35.041, .062, .121.

### III

The property-poor districts' central argument is that Senate Bill 7 fails to provide an efficient system of public education, as required by article VII, section 1 of the Texas Constitution. In *Edgewood I,* this Court held that the school finance system was unconstitutional because it was "neither financially efficient nor efficient in the sense of providing for a 'general diffusion of knowledge' statewide." *Edgewood I,* 777 S.W.2d at 397. While we considered the financial component of efficiency to be implicit in the Constitution's mandate, the qualitative component is explicit:

> A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

Tex. Const. art. VII, § 1. Because of the vast disparities in access to revenue at the time *Edgewood I* was decided, we did not then decide whether the State had satisfied its constitutional duty to suitably provide for a general diffusion of knowledge. We focused instead on the meaning of financial efficiency:

> GOAL F: The organization and management of all levels of the education system will be productive, efficient, and accountable.
> GOAL G: Instruction and administration will be improved through research that identifies creative and effective methods. Demonstration programs will be developed and local

There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort.

*Edgewood I,* 777 S.W.2d at 397. In the same opinion, we also said that the constitutional requirement of efficiency does not preclude local communities "from supplementing an efficient system established by the legislature." *Edgewood I,* 777 S.W.2d at 398. In *Edgewood I,* we did not decide whether districts must be afforded equal access to such supplemental revenue.

We addressed the issue of unequalized local supplementation on motion for rehearing in *Edgewood II.* In that case, we held that the Constitution permits school districts to generate and spend local taxes to enrich or supplement an efficient system, and that such enrichment need not be equalized. *Edgewood II,* 804 S.W.2d at 499. We concluded:

> The current system remains unconstitutional not because *any* unequalized local supplementation is employed, but because the State relies so heavily on unequalized local funding in attempting to discharge its duty to 'make suitable provision for the support and maintenance of an efficient system of public free schools.' Tex. Const. art. VII, § 1. Once the Legislature provides an efficient system in compliance with article VII, section 1, it may, so long as efficiency is maintained, authorize local school districts to supplement their education resources if local property owners approve an additional local property tax.

*Edgewood II,* 804 S.W.2d at 500 (footnote omitted).

■ It is apparent from the Court's opinions that we have recognized that an efficient system does not require equality of access to revenue at all levels. Otherwise, unequalized

> initiatives encouraged for new instructional arrangements and management techniques. Technology will be used to increase the equity, efficiency, and effectiveness of student learning, instructional management, staff development, and administration.
> Tex.Educ.Code § 35.001.

local supplementation, which we expressly approved in *Edgewood II*, could never be justified. Article VII, section 1 of the Constitution and our previous *Edgewood* decisions mandate that efficiency be measured against both qualitative and financial standards.

■ The district court viewed efficiency as synonymous with equity, meaning that districts must have *substantially* equal revenue for substantially equal tax effort *at all levels of funding*. This interpretation ignores our holding in *Edgewood II* that unequalized local supplementation is not constitutionally prohibited. The effect of this "equity at all levels" theory of efficiency is to "level-down" the quality of our public school system, a consequence which is universally regarded as undesirable from an educational perspective. Under this theory, it would be constitutional for the Legislature to limit all districts to a funding level of $500 per student as long as there was equal access to this $500 per student, *even if* $3500 per student were required for a general diffusion of knowledge. Neither the Constitution nor our previous *Edgewood* decisions warrant such an interpretation. Rather, the question before us is whether the financing system established by Senate Bill 7 meets the financial and qualitative standards of article VII, section 1.

■ In Senate Bill 7, the Legislature equates the provision of a "general diffusion of knowledge" with the provision of an accredited education. The accountability regime set forth in Chapter 35, we conclude, meets the Legislature's constitutional obligation to provide for a general diffusion of knowledge statewide.[8]

■ *Edgewood I* and *Edgewood II* also require financial efficiency; that is, districts must have substantially equal access to funding up to the legislatively defined level that achieves the constitutional mandate of a general diffusion of knowledge.[9] Unlike the school finance systems at issue in *Edgewood I* and *Edgewood II*, we conclude that the system established by Senate Bill 7 is financially efficient.

At the time of *Edgewood I*, vast disparities in school districts' property wealth produced corresponding disparities in the districts' ability to raise revenue. The wealthiest districts had more than $14,000,000 of taxable property wealth per student while the poorest had approximately $20,000, a 700 to 1 ratio. *Edgewood I*, 777 S.W.2d at 392. The State did little to mitigate these differences: the Foundation School Program did not cover even the cost of meeting state-mandated educational requirements, and virtually no effort was made to equalize yields at any level of tax effort. Thus, property-rich districts were able to tax low and spend high, while property-poor districts were forced to tax high to spend low. This basic disparity could be measured in terms of yield per cent of tax effort: the five percent of students in the poorest districts received only $26.82 per weighted student for every cent of tax effort, while the five percent of students in the wealthiest districts enjoyed more than twice as much—$54.11—for the same effort.

Under the system established by Senate Bill 7, this picture has changed dramatically. Instead of a 700–to–1 ratio between the richest and poorest districts, there is now a 28–to–1 ratio. Furthermore, the $20.55 yield guarantee within Tier 2 effectively reduces this ratio further. The State meets its con-

---

8. In Senate Bill 7, the Legislature fulfills its mandate to provide a general diffusion of knowledge by establishing a regime administered by the State Board of Education. The Constitution does not require, however, that the State Board of Education or any state agency fulfill this duty. As long as the Legislature establishes a suitable regime that provides for a general diffusion of knowledge, the Legislature may decide whether the regime should be administered by a state agency, by the districts themselves, or by any other means.

 This is not to say that the Legislature may define what constitutes a general diffusion of knowledge so low as to avoid its obligation to make suitable provision imposed by article VII, section 1. While the Legislature certainly has broad discretion to make the myriad policy decisions concerning education, that discretion is not without bounds. *See* 917 S.W.2d at 732 & n. 14, *infra*.

9. Under the system established by the Legislature in Senate Bill 7, this means that each district must have substantially equal access to the funds necessary to provide an accredited education.

stitutional duty to provide a general diffusion of knowledge through funding provided by Tiers 1 and 2,[10] and the disparity in access to funds within these tiers is 1.36-to-1. Children who live in property-poor districts and children who live in property-rich districts now have substantially equal access to the funds necessary for a general diffusion of knowledge. Thus, we hold that Senate Bill 7 is efficient under article VII, section 1 of the Texas Constitution.

The property-poor districts acknowledge that significant progress has been made since *Edgewood I.* They argue, though, that the revenue system remains inefficient because of numerous defects in Senate Bill 7. For the reasons explained below, we disagree.

## A. *The $600 gap*

■ The property-poor districts point out that the $600 advantage enjoyed by the wealthiest districts at a $1.50 tax rate is an inherent, permanent part of the system established by Senate Bill 7. For each additional penny of tax effort between $0.86 and $1.50, the State guarantees school districts a yield of $20.55 per weighted student; but the wealthiest districts—those with property wealth of $280,000 per student—will be able to raise $28.00 per weighted student from their own tax bases. When multiplied over the full 64-cent range of Tier 2, this difference in yield, combined with the unequalized distribution of other funds,[11] leads to a systemic gap of up to $600 per weighted student at a tax rate of $1.50 between the wealthiest districts and all other districts. The proper-

ty-poor districts argue that this gap will leave them with a permanent educational disadvantage.

■ However, the property-poor districts' complaint that the $600 gap renders Senate Bill 7 inefficient is premised on an erroneous view of the meaning of efficiency. The State's duty to provide districts with substantially equal access to revenue applies *only* to the provision of funding necessary for a general diffusion of knowledge. Although the Legislature has chosen to equalize funding up to a tax rate of $1.50, the evidence established that, currently, all districts can attain the funding for a general diffusion of knowledge at a lower tax rate. Property-poor and property-rich districts presently can attain the revenue necessary to provide suitably for a general diffusion of knowledge at tax rates of approximately $1.31 and $1.22, respectively.[12] Thus, our constitutional inquiry must focus on that disparity, rather than on the $600 gap that occurs at a $1.50 tax rate.

■ The disparity in tax rates has been dramatically reduced since the time of *Edgewood I.* Furthermore, Tier 2 eliminates such tax rate disparity for 85 percent of the students in the State by providing all districts with a $20.55 guaranteed yield. All districts are able to provide for a general diffusion of knowledge, but property-poor districts must tax at a slightly higher rate than property-rich districts to do so. When the focus is placed on the rate differential rather than on the gap in funding, it becomes evident that

10. Based on the evidence at trial, the district court found that meeting accreditation standards, which is the legislatively defined level of efficiency that achieves a general diffusion of knowledge, requires about $3,500 per weighted student. After adjustments, the Tier 1 allotment provides, on average, only $2,537 per weighted student. Tier 2, however, enables a district to add up to $1,315.20 to this amount ($20.55 per cent of tax times 64 cents). Thus, the district court found that every district can provide an accredited education with funding provided by Tiers 1 and 2.

Obviously, future legal challenges may be brought if a general diffusion of knowledge can no longer be provided within the equalized system because of changed legal or factual circumstances.

11. The Available School Fund is still distributed on a per-capita basis and contributes about $300 per student annually. *See Edgewood III*, 826 S.W.2d at 494 n. 5; *Edgewood II*, 804 S.W.2d at 495 n. 10.

12. After Senate Bill 7 is fully implemented, districts with the poorest 15% of students will have an average yield per cent of tax effort of $26.74, whereas districts with the richest 15% of students will have an average yield per cent of tax effort of $28.74. It follows, then, that to provide a general diffusion of knowledge, *see supra* n. 10, the three lowest wealth groups must tax at a rate of approximately $1.31 ($3500 divided by $26.74) and the three highest wealth groups must tax at a rate of approximately $1.22 ($3500 divided by $28.74).

the existing disparity in access to revenue is not so great that it renders Senate Bill 7 unconstitutional.

### B. *The $1.50 cap*

 The property-poor districts also point out that the $600 gap will become much greater to the extent that districts are allowed to tax at effective rates above $1.50. Because the State provides no Tier 2 funds at rates in excess of $1.50, any revenues generated from such higher rates (referred to as Tier 3) are completely unequalized. The wealthier districts, drawing on tax bases of up to $280,000 per student, are able to generate as much as $28.00 per student with every one-cent tax increase, but the poorer districts, drawing on tax bases as low as $9,500 per student, are able to generate as little as $0.95 per student with the same tax increase. Section 20.09 limits the circumstances in which a district can impose a total tax rate that exceeds $1.50:

> Except as provided by subsections (c) and (d) *and unless specifically approved in an election called for that purpose,* a school district may not impose a total tax rate on the $100 valuation of taxable property that exceeds $1.50.

TEX.EDUC.CODE § 20.09(a) (emphasis added). Subsection (c) of section 20.09 allows a district to exceed the $1.50 limit for the purpose of collecting taxes pledged and levied to pay the principal of and interest on old debt, that is, debt authorized before April 1, 1991, and issued before September 1, 1992. Subsection (d) creates a similar exception for new debt, subject to some restrictions.[13]

The property-poor districts argue that the language in section 20.09 italicized above, which was added by an amendment during floor debate on Senate Bill 7 in the House of Representatives, allows a district to exceed a $1.50 total tax rate for any purpose whenever such a rate is approved by the district's voters in an election called for that purpose. Because this option would give property-rich districts much greater access to revenue for maintenance and operations purposes than property-poor districts would have at similar rates, the property-poor districts argue that the amendment makes the financing system inefficient.

First of all, we disagree with the property-poor districts' interpretation of section 20.09. Under section 20.04(d), a district's authority to levy maintenance and operations taxes is generally capped at a rate of $1.50. The amendment to section 20.09 did not affect the independent limitation on maintenance and operations rates imposed by section 20.04(d).

 Furthermore, even under the property-poor districts' construction of section 20.09, Senate Bill 7 would not be rendered inefficient. It is within the Legislature's power to establish tax rate caps even though such caps are not constitutionally required. As long as efficiency is maintained, it is not unconstitutional for districts to supplement their programs with local funds, *even if* such funds are unmatched by state dollars and *even if* such funds are not subject to statewide recapture. We caution, however, that the amount of "supplementation" in the system cannot become so great that it, in effect, destroys the efficiency of the entire system. The danger is that what the Legislature today considers to be "supplementation" may tomorrow become necessary to satisfy the constitutional mandate for a general diffusion of knowledge.[14]

 There are, in fact, a number of Texas Education Code Auxiliary Laws[15] that presently permit some districts to levy a maintenance and operations tax in excess of

---

13. Before issuing bonds for new debt, a district must demonstrate to the attorney general a projected ability to pay off the bonds, and all other bonds except those exempt under subsection (c), from a rate of no more than $0.50 per $100 and a total tax rate of no more than $1.50. Once the bonds are approved, the district may exceed a $1.50 rate to the extent necessary to pay off the bonds without reducing maintenance and operations expenditures.

14. This is simply another way of saying that the State's provision for a general diffusion of knowledge must reflect changing times, needs, and public expectations. *See supra* n. 8.

15. These laws are: art. 2784g–1; art. 2784e–2; art. 2784e–5; art. 2784e–6; art. 2784e–7; art. 2784e–11; art. 2784e–13; art. 2784e–17; art. 2784g; Chapter 304, Acts of the 63rd Legislature (1973); and Chapter 541, Acts of the 64th Legislature (1975).

$1.50. In particular, article 2784g permits districts in counties with a population exceeding 700,000 to set a maintenance and operations tax rate of up to $2.00.[16] TEX.EDUC.CODE AUX.LAWS art. 2784g [Act of May 14, 1953, 53rd Leg., R.S., ch. 273, 1953 Tex.Gen.Laws 710, *amended by* Act of February 12, 1959, 56th Leg., R.S., ch. 7, 1959 Tex.Gen.Laws 14]. These laws pose no threat to the constitutionality of Senate Bill 7. Once all districts are provided with sufficient revenue to satisfy the requirement of a general diffusion of knowledge, allowing districts to tax at a rate in excess of $1.50 creates no constitutional issue. Districts that choose to tax themselves at a higher rate under these laws are, under this record, simply supplementing an already efficient system.

## C. *The transition period*

■ The property-poor districts also raise several complaints involving the transition toward full implementation of Senate Bill 7. First, they note that the calculation of state aid will now be subject to a "biennium lag." Senate Bill 7 limits a district's state aid to "the amount to which the district would be entitled at the district's tax rate for the final year of the preceding biennium." TEX.EDUC.CODE § 16.254(e). Thus, when a district raises its tax rate, the additional tax effort is not recognized by the State for one or two years. This lag time has an uneven impact: property-poor districts must wait one or two years for additional state equalization money, but property-rich districts have immediate access to the greater revenues generated from their own tax bases.

While the biennium lag does impact efficiency in the short term, there are considerations to be weighed against those concerns. If biennial funding decisions are based on assumptions regarding future tax rates, mid-year proration becomes necessary to adjust for any shortfall in appropriations caused by local tax decisions. The State argues that such proration is poor public policy, and its evidence at trial indicated that proration may

actually be disequalizing. On this basis, we agree with the State that the Legislature's avoidance of proration is a legitimate exercise of legislative policy-making that does not compel the conclusion that the finance system is thereby rendered inefficient.

■ The property-poor districts also dispute changes made by Senate Bill 7 regarding tax rollback elections. Formerly, the voters of a school district could petition for a rollback election whenever the district raised its tax rate by $0.08 or more. A successful rollback election operated to limit the rate the district could adopt for the following year.

Senate Bill 7 changed these rules in several respects. *See* TEX.TAX CODE § 26.08. First, calculation of the district's rollback tax rate begins with its "rate to stay even," rather than the actual tax rate for the prior year. In a district receiving a new infusion of money, the rate required to stay even may be substantially lower than the actual rate for the prior year. Second, the trigger is now set at an increase of only $0.06, rather than $0.08. Third, the rollback election is now automatic; no voter petition is necessary. Finally, if the election proposition passes, the tax rate is rolled back for the current year, rather than the following year, raising the possibility that mid-year budget cuts may become necessary.

These changes, taken together, will tend to make significant tax increases more difficult. There is no evidence, however, that the changes will significantly affect the implementation of Senate Bill 7. The record reflects that in 1992–93, the average tax rate statewide was already $1.28, and this rate had been rising over the past four years at an average of over $0.10 per year. Moreover, the new provisions allowed a district to adopt a 1993–94 tax rate—without fear of a rollback election—at whatever level was necessary to generate the revenue it received in 1992–93.

---

**16.** The Alvarado group of property-poor districts has attached to its brief a copy of a district court judgment holding that § 20.09 does not limit a school district's taxing authority under art.

2784g. *Ex parte Spring Branch I.S.D.*, No. 94-011325 (Dist.Ct. of Harris County, 129th Judicial Dist. of Texas, April 4, 1994).

■ Another complaint regarding the transition period is that Senate Bill 7 allows the wealthiest districts to keep some portion of their excess wealth, *i.e.*, their property wealth in excess of $280,000 per student, for three years, while no corresponding phase-in is provided for the poorer districts. *See* TEX.EDUC.CODE § 36.002(b), (c). The property-poor districts' own evidence, however, indicates that 87 percent of Senate Bill 7's wealth reduction was accomplished in 1993–94; over $35 billion of property wealth was brought into the system, and only $4.7 billion was retained under the phase-in provisions. Less than that will be retained in 1994–95 and 1995–96, and none will be retained thereafter. Additionally, the transition period for poorer school districts has been eased to some extent by the Commissioner of Education's redistribution of excess CED funds.[17] We hold, therefore, that Senate Bill 7's phase-in provisions do not have such an unfavorable effect on poorer school districts as to make the finance system inefficient.

## D. *Funding formula reductions*

■ The property-poor districts also criticize the changes that Senate Bill 7 made in the State's funding formulas. In 1992–93, under Senate Bill 351, the basic allotment in Tier 1 was $2,400; Senate Bill 7 reduces it to $2,300. The guaranteed yield in Tier 2 was previously $22.50 for tax effort from $0.83 to $1.27; under Senate Bill 7, it is $20.55 for tax effort between $0.87 and $1.50. The property-poor districts argue that these reductions in the basic allotment and guaranteed yield represent a retreat from previous efforts to achieve efficiency, which will have an especially detrimental effect on poorer districts.

Initially, we note that the Senate Bill 351 system is of limited usefulness as a basis for measuring the efficiency of the present system. We specifically noted in *Edgewood III* that the issue of efficiency was not then before the Court. 826 S.W.2d at 494.

The record establishes, moreover, that Senate Bill 7 continues the State's movement toward efficiency. For many of the poorer school districts, the immediate effect of Sen-

ate Bill 7 was a setback from Senate Bill 351; but in comparison with the system existing at the time of *Edgewood I*, Senate Bill 7 provides even the poorest districts with vastly improved access to revenue. At full implementation of the system, the poorest districts containing five percent of the state's students will have 78 percent more revenue per student than they had in 1988–89. While the basic allotment is clearly too low to meet the goals of Tier 1, the availability of the guaranteed yield at effective rates as high as $1.50 enables every school district to meet or exceed the requirements for accreditation and other legal standards.[18] In view of these facts, the differences between the funding formulas of Senate Bill 7 and Senate Bill 351 do not compel the conclusion that the system embodied in Senate Bill 7 is inefficient.

The property-poor districts' concerns regarding the funding formulas in Senate Bill 7 are shared, in some respects, by the property-rich districts. We now turn to those districts' specific complaints.

## IV

As discussed above, the property-poor districts' arguments focus primarily on efficiency problems: the disparities in districts' access to revenue under Senate Bill 7. The property-rich districts, in contrast, focus primarily on revenue: the mechanism through which Senate Bill 7 provides the funds to achieve efficiency.

The cornerstone of Senate Bill 7's funding mechanism is the $280,000–per–student cap on a district's taxable property, described in Part II, *supra*. The cap allows the State to tap the reservoirs of taxable property situated in property-rich districts. This Court emphasized the significance of these reservoirs in *Edgewood I*:

> Efficiency ... does not allow concentrations of resources in property-rich districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards.

---

17. *See infra* Part VII.

18. *See supra* n. 10.

777 S.W.2d at 397. We then elaborated on the problem in *Edgewood II*:

> [T]he current system insulates concentrated areas of property wealth from being taxed to support the public schools. The result is that substantial revenue is lost to the system. If the property in these and similar districts were taxed at substantially the same rate as the rest of the property in the state, the system could have hundreds of millions of additional dollars at its disposal. Whether this additional revenue were used to increase the attainable equalized funding level, ease the State's burden, or lower the tax rate each district must impose, the system would be made more efficient simply by utilizing the resources in the wealthy districts to the same extent that the remainder of the state's resources are utilized.

804 S.W.2d at 497. The $280,000 cap enforces the approach this language suggests; with the cap in place, the resources in the wealthiest districts are burdened to substantially the same extent as are the remainder of the State's resources. In 1993–94, the cap affected over $35 billion in property wealth and yielded some $400 million in additional revenue.

The State justifies the $280,000 cap on the basis of the Legislature's authority, under article VII, section 3 of the Texas Constitution, to "provide for the formation of school district[s] by general laws." As recently as *Edgewood III*, we reiterated that this provision gives the Legislature a "free hand in establishing independent school districts." 826 S.W.2d at 510–11.

The property-rich districts acknowledge the Legislature's broad authority in establishing school districts, but nonetheless argue that the State's implementation of the $280,000 cap violates a variety of constitutional provisions. The property-rich districts also argue that the State's heavy reliance on local funds, including funds drawn as a result of the $280,000 cap, represents an abdication of the State's responsibility to provide for edu-

cation. We consider these arguments in turn.

## A. *Suitable provision*

 In *Edgewood III*, we recognized that "local ad valorem taxes now are expected to provide most of the basic needs of education." 826 S.W.2d at 494. This fact, we wrote, does not in itself signify a constitutional violation:

> [L]ocal revenue may play a role in achieving an efficient system of free public schools.... We have not attempted to dictate to the Legislature what part local revenue should play in funding public education, viewing that decision as properly the Legislature's prerogative in the first instance. Although the Constitution requires the Legislature to "establish and make suitable provision for" free public schools, it contains no specific requirement that public education be funded completely with state revenue.

*Id.* at 503.

The property-rich districts argue, however, that the State's reliance on local revenue is so great that it violates the Constitution. Under Senate Bill 7, locally-generated revenue accounts for about 57 percent of all state and local spending on education, as compared with about 54 percent at the time of *Edgewood III*.[19] By providing only 43 percent of education costs, the property-rich districts argue, the State has violated its duty to "make suitable provision for" the public school system, as required by article VII, section 1 of the Texas Constitution.

 Article VII, section 1, imposes a "mandatory duty" on the Legislature to establish an education system. *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 35 (1931). In *Edgewood I*, we reaffirmed that the requirement of suitability is a judicially-enforceable mandate:

> By express constitutional mandate, the legislature must make "suitable" provision for an "efficient" system for the "essential" purpose of a "general diffusion of knowl-

---

19. Federal funds continue to provide a relatively small portion of the total funds spent; thus, they are not considered in the discussion of the state- local shares. *See Edgewood III*, 826 S.W.2d at 494 n. 4.

edge." While these are admittedly not precise terms, they do provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions. . . . If the system is not "efficient" or not "suitable," the legislature has not discharged its constitutional duty and it is *our* duty to say so.

777 S.W.2d at 394. We have not, however, attempted to dictate to the Legislature the means by which this duty is to be fulfilled:

> Since the Legislature has the mandatory duty to make suitable provision for the support and maintenance of an efficient system of public free schools, and has the power to pass any law relative thereto, not prohibited by the Constitution, it necessarily follows that it has a choice in the selection of methods by which the object of the organic law may be effectuated. The Legislature alone is to judge what means are necessary and appropriate for a purpose which the Constitution makes legitimate. The legislative determination of the methods, restrictions, and regulations is final, except when so arbitrary as to be violative of the constitutional rights of the citizen.
>
> . . . .
>
> The word "suitable," used in connection with the word "provision" in this section of the Constitution, is an elastic term, depending upon the necessities of changing times or conditions, and clearly leaves to the Legislature the right to determine what is suitable, and its determination will not be reviewed by the courts if the act has a real relation to the subject and object of the Constitution.

*Mumme v. Marrs,* 40 S.W.2d at 36.

■ The property-rich districts argue that the Legislature itself has established standards for measuring suitability and has failed to meet those standards. In particular, the districts point to two general provisions in the Texas Education Code: section

16.001 ("State Policy"), which provides that the education system is to be "substantially financed through state revenue sources;" and section 16.002 ("Purpose of Foundation School Program"), which states that Tier 1 "guarantees sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards." As the district court correctly noted, the Legislature's funding obligations are generally limited to what it appropriates, regardless of what it promises in other statutes. *See Mutchler v. Texas Dep't of Pub. Safety,* 681 S.W.2d 282, 284–85 (Tex. App.—Austin 1984, no writ). We accordingly reject the property-rich districts' arguments that Senate Bill 7, under the present circumstances, has failed to make suitable provision for the public school system.

■ In a related argument, the Humble group of appellants asserts that the present finance system is unconstitutional because it fails to fund mandates imposed on local districts by state law. The district court rejected this argument on legal grounds, and severed related factual matters as "so-called adequacy questions" to be decided in a later trial if necessary.[20] Even so, as noted in Part III, *supra,* the district court found that every district can meet accreditation and other legal standards from Tier 1 and Tier 2 funding. On this record, therefore, we reject Humble's argument. On the same basis, we reject the corollary argument that the Legislature's mandates are void until such time as the Legislature provides additional funding.

■ Certainly, if the Legislature substantially defaulted on its responsibility such that Texas school children were denied access to that education needed to participate fully in the social, economic, and educational opportunities available in Texas, the "suitable provision" clause would be violated. The

---

20. Among other claims, the district court severed the following issues:

 a. whether the legislature appropriates sufficient funds to pay a majority of the cost of education;

 b. whether the legislature pays for state mandated costs in each school district; and

 c. whether the legislature appropriates sufficient funds for districts to provide a constitutionally, minimally acceptable education.

The parties have not challenged this severance, and we express no opinion on the propriety of the district court's severance. However, further proceedings, if any, should be conducted in accordance with this opinion.

present record, however, does not reflect any such abdication. Total state aid has risen dramatically since 1988–89, from $4.9 billion to over $7 billion; and while the wealthiest districts are now receiving substantially less from the State than in 1988–89, total state and local revenue has grown significantly for all districts. Given these facts, we hold that the Legislature has not violated its constitutional duty to make "suitable provision" for the public school system.

B. *State ad valorem tax*

■ The property-rich districts also argue that the new finance system, viewed as a whole, effectively imposes a statewide ad valorem tax in violation of article VIII, section 1–e of the Texas Constitution. In *Edgewood III*, this Court set out the following test for determining whether a particular ad valorem tax is a statewide tax in violation of article VIII, section 1–e:

> An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion.

826 S.W.2d at 502. In doing so, we recognized that the boundary between a state-encouraged local tax and a statewide tax was "difficult to delineate:"

> Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of possibilities.

*Id.* at 502–03. The tax in the present case lies somewhere in that "spectrum of possibili-

ties." Senate Bill 7 does not leave the imposition of a property tax entirely up to local authorities, to be approved "if necessary." To receive any Foundation School Fund payments at all, a district must tax at an effective rate of at least $0.86. *See* TEX.EDUC. CODE § 16.252(a), (d). Senate Bill 7 does not, however, mandate a set rate or prescribe the distribution of the proceeds. While a district may maximize its state aid by taxing at $1.50, there is no requirement that it do so. Thus, Senate Bill 7 most closely resembles the third scenario we described in *Edgewood III:*

> If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e.

826 S.W.2d at 503.

The property-rich districts insist that Senate Bill 7 gives the State such complete control over the finance system that local districts are left with no meaningful discretion. They complain, in particular, that Senate Bill 7 requires rollback elections for rate increases of more than $0.06, places extensive restrictions on each of the five options that may be used to lower district wealth, and sets minimum and maximum tax rates.

■ The requirement of rollback elections imposes no such limits. At worst, it may only slow a district's efforts to reach a desired rate. Nor is a district's taxing discretion reduced by restrictions on the five options. While the exercise of certain options may affect the disbursement of tax proceeds, any such effects are attributable to the district's own selection of particular options.[21]

■ The property-rich districts are correct, however, that Senate Bill 7 does, to some extent, limit the districts' discretion in choosing a tax rate by imposing minimum and maximum tax rates; however, the imposition of such limits does not render Senate Bill 7 unconstitutional. Districts are still

---

21. For example, if a property-rich district were to consolidate with a property-poor district (option 1), or detach some of its property (option 2),

it would be free of such restrictions on the disbursement of revenue.

free to set a tax rate within a range, which includes, for some districts, a maximum rate of $2.00 under article 2784g. Although financial incentives for property-poor districts and the desire to maintain previous levels of revenue in the property-rich districts may *encourage* districts to tax at the maximum allowable rate, the State in no way requires them to do so. Thus, the State's imposition of such limits does not presently "so completely [control] the levy, assessment, and disbursement of revenue, either directly or indirectly, that the [district] is without meaningful discretion." *See Edgewood III*, 826 S.W.2d at 502.

However, if the cost of providing for a general diffusion of knowledge continues to rise, as it surely will, the minimum rate at which a district must tax will also rise. Eventually, some districts may be forced to tax at the maximum allowable rate just to provide a general diffusion of knowledge. If a cap on tax rates were to become in effect a floor as well as a ceiling, the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable because the districts would then have lost all meaningful discretion in setting the tax rate.

Taken together, these restrictions do not at this time approach the level of control exercised in Senate Bill 351, which set uniform tax rates and prescribed the distribution of all tax proceeds. We accordingly conclude that the State's control under Senate Bill 7 is not presently so great as to fall within the prohibition of article VIII, section 1–e.

■ The Stafford appellants emphasize the Legislature's heavy reliance on local ad valorem taxes and urge that the use of such taxes to fulfill a state obligation amounts to the imposition of a state tax. We recognized in *Edgewood III* that the framers and ratifiers of article VIII, section 1–e "specifically intended to eliminate the state ad valorem tax as a source of funds for public education." 826 S.W.2d at 502. We did not, however, hold that local taxes supporting education would automatically be considered state taxes. To the contrary, we left to the Legislature the question of what part local revenue should play in funding education, noting that

the Constitution "contains no specific requirement that public education be funded completely with state revenue." *Id.* at 503. Thus, we hold that the State's reliance on local ad valorem taxes does not amount to the imposition of a state tax.

C. *Love v. City of Dallas*

■ A closely-related argument involves the limitations on the Legislature's authority over school districts established in *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931). In *Love*, this Court held that the Legislature could not compel a school district to use its resources for the education of students who resided outside the district because both article VII, section 3 of the Texas Constitution and the statutes governing the levying of taxes for the district contemplated that districts would be organized and taxes levied for the education of students who resided within the districts. *Id.* 40 S.W.2d at 27. The property-rich districts assert that *Love* established a constitutional requirement that local tax dollars be spent solely on local students. Insofar as Senate Bill 7 infringes on this requirement, the districts argue, it violates article VII, section 3, and amounts to the imposition of a state property tax.

In *Love*, this Court upheld the constitutionality of the High School Tuition Law by construing it in a manner that left discretion with local school boards. If a school board determined, in its sound discretion, that admission of nonresident students would not be prejudicial to resident students, the act would allow their admission at the statutory rate of compensation. 40 S.W.2d at 30–31. Because the act did not *compel* local school districts to accept nonresident students without reasonable compensation, we held that it was not necessarily unconstitutional.

Senate Bill 7 does not violate the principles set forth in *Love*. The Bill does not compel any district to pay for the education of nonresident students. A district with wealth in excess of $280,000 per student may choose any of three options to avoid paying for the education of nonresidents: it may consolidate with another district (option 1); detach a portion of its territory (option 2); or consoli-

**739**

date its tax base with that of another district (option 5). Even if it fails to choose such an option, it still will not be compelled to pay for the education of nonresidents; the Commissioner of Education will either detach a portion of its property or consolidate it with another district. In any of these circumstances, no school property or funds leave the district; rather, the district is simply reconfigured by authority of the Legislature's "free hand in establishing independent school districts," discussed in Part IV. *Love* itself recognized the Legislature's discretion to "abolish school districts or enlarge or diminish their boundaries, or increase or modify or abrogate their powers." *Love*, 40 S.W.2d at 26.

Like the High School Tuition Law, Senate Bill 7 allows taxpayers to choose, at their discretion, to pay for the education of nonresident students. Option 3 allows a district to reduce its property wealth by purchasing average daily attendance credit, while option 4 allows it to contract for the education of nonresident students. Both options require approval by the voters of the district.

 The property-rich districts argue that the selection of a wealth-reducing option is not a free choice at all, because the various alternatives are all undesirable. Thus, invoking the doctrine of unconstitutional conditions, the property-wealthy districts assert that Senate Bill 7 represents an unlawful attempt to force voters to surrender their constitutional rights under *Love*. This argument suffers from two defects. First, it finds a "constitutional right" where none exists. Article VII, section 3 does not create any "rights." It only authorizes the Legislature to establish school districts and to empower the districts to levy taxes for specific purposes. The school districts' rights, to the extent they exist, are derived solely from the statutes that the Legislature may enact under the authority granted in section 3.

 Second, assuming such rights did exist, the school districts do not have the right to spend tax revenue derived from property in excess of the $280,000 cap. Under Senate Bill 7, the Legislature has effectively withdrawn the school districts' right to tax property values in excess of the cap. If

the Legislature gives districts the right to tax in the first place, it is certainly within the Legislature's power to limit such authority. There is clearly some tension between school districts' interest in retaining locally-generated funds and the Legislature's interest in fulfilling its constitutional duty to establish an efficient system of public schools through local taxation. That tension must be resolved, though, in a manner that allows the Legislature to fulfill its obligation:

> The Constitution, having made it the mandatory duty of the Legislature to "make suitable provision for the support and maintenance of an efficient system of public free schools," necessarily conferred the power to make it effective.

*Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 36 (1931). For the reasons discussed in our prior opinions, the Texas finance system under Senate Bill 7 could not be efficient as long as it denied access to the pools of wealth concentrated in the wealthiest districts. With that fact in view, we decline to hold that the access Senate Bill 7 allows to such wealth violates *Love*.

### D. *Lending of credit or grant of public money*

 The Sterling City and Crockett County districts argue that the Senate Bill 7 financing system is invalid because it authorizes or requires districts to lend credit or grant public funds in violation of article III, sections 51 and 52 of the Texas Constitution. Those provisions, they argue, prohibit the use of local tax revenues for the aid of a separate political subdivision in lieu of needed state funds. *See generally San Antonio Indep. Sch. Dist. v. Board of Trustees*, 204 S.W.2d 22, 25 (Tex.Civ.App.—El Paso 1947, writ ref'd n.r.e.) ("A city cannot donate its funds to an independent municipal corporation such as an independent school district.").

Section 51 of article III prohibits the Legislature from authorizing a grant of public moneys "to any individual, association of individuals, municipal or other corporations whatsoever," with certain exceptions. Section 52(a) of article III serves a related purpose; it prohibits the Legislature from authorizing a political subdivision to "lend its

credit or to grant public money or thing of value in aid of, or to any individual, association, or corporation whatsoever, or to become a stockholder in such corporation, association or company." [22] Generally speaking, both sections are intended "to prevent the application of public funds to private purposes; in other words, to prevent the gratuitous grant of such funds to any individual, corporation, or purpose whatsoever." *Byrd v. City of Dallas*, 118 Tex. 28, 6 S.W.2d 738, 740 (1928).

█ Chapter 36 of the Texas Education Code, as amended by Senate Bill 7, does not authorize the use of public funds for private purposes, or any gratuitous grant of public funds. When a district with wealth in excess of $280,000 per student chooses to reduce its wealth through either option 3 (purchasing of average daily attendance credits) or option 4 (contracting for the education of nonresident students), some funds must be transferred outside the district. *See* TEX.EDUC.CODE §§ 36.094, .121. Such a transfer, however, is not for private purposes, nor is it a gratuity; rather, it is the price the voters in the school district choose to pay for the preservation of the district's current boundaries. A transfer of funds for a public purpose, with a clear public benefit received in return, does not amount to a lending of credit or grant of public funds in violation of article III, sections 51 and 52.

E. *Delegation of power*

█ The Carrollton–Farmers Branch appellants argue that Senate Bill 7 is an unconstitutional delegation of power to the Com-

missioner of Education. They point out that the bill gives the Commissioner extensive rulemaking authority, as well as powers of detachment, annexation, and consolidation. *See* TEX.EDUC.CODE §§ 36.006 (rulemaking), 36.205–.206 (detachment and annexation), 36.251–.257 (consolidation). These provisions, they argue, are unaccompanied by sufficient standards, and therefore amount to a delegation of legislative authority in violation of the constitutional requirement of separation of powers. *See* TEX.CONST. art. II, § 1 (division of powers).

█ The Texas Legislature may delegate its powers to agencies established to carry out legislative purposes, as long as it establishes "reasonable standards to guide the entity to which the powers are delegated." *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992) (quoting *State v. Texas Mun. Power Agency*, 565 S.W.2d 258, 273 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ dism'd)). "Requiring the legislature to include every detail and anticipate unforeseen circumstances would ... defeat the purpose of delegating legislative authority." *Id.*

The broadest delegation of authority in Senate Bill 7 is in section 36.006, which authorizes the Commissioner to adopt rules necessary for the implementation of Chapter 36.[23] This section, read literally, appears to confer broad authority on the Commissioner to modify the Foundation School Program as set out in Chapter 16 of the Texas Education Code. The State asserts, however, that section 36.006 authorizes the Commissioner to change funding elements only to the extent

---

**22.** Section 52, unlike other related provisions, does not expressly refer to *municipal* corporations. *Cf.* art. III, § 50 (prohibiting loans to a "corporation, whether municipal or other," and grants to "municipal or other corporations"), 51 (referring to "municipal or other corporations"). For that reason, the argument has been made that § 52 should not be read to apply to the granting of public funds from one municipal corporation to another. *See* 1 GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 257 (1977). Because we hold that § 52 is inapplicable for other reasons, we do not reach this issue today.

**23.** Section 36.006 provides:
 (a) The commissioner of education may adopt rules necessary for the implementation

of this chapter. The rules may provide for the commissioner to make necessary adjustments to the provisions of Chapter 16, including providing for the commissioner, with the approval of the foundation school fund budget committee, to make an adjustment in the funding element established by Section 16.302, at the earliest date practicable, to the amount the commissioner believes, taking into consideration options exercised by school districts under this chapter and estimates of student enrollments, will match appropriation levels.
 (b) As necessary for the effective and efficient administration of this chapter, the commissioner of education may modify effective dates and time periods for actions described by this chapter.

necessary to match such funding elements with appropriations. We agree that this administrative function, which the State refers to as "merely a ministerial calculation," does not involve the sort of discretion that would require more extensive standards. *Cf. Jordan v. State Bd. of Ins.*, 160 Tex. 506, 334 S.W.2d 278, 280 (1960) (noting that reasonable certainty in the statutory standard is not always dependent on detailed rules).[24]

■ With regard to the Commissioner's powers of detachment, annexation, and consolidation, the Carrollton–Farmers Branch appellants argue not that the Commissioner's discretion is too broad, but rather that it is too narrow. Senate Bill 7 includes specific, objective criteria for the Commissioner to apply in making these determinations. *See* TEX.EDUC.CODE §§ 36.205 (detachment), 36.206 (annexation), 36.252 (consolidation). Absent from these criteria are such practical considerations as the distances affecting West Texas districts or the educational impact of consolidation on children. The appellants thus argue that the Legislature has failed to prescribe "sufficient standards to guide the discretion conferred." *See In re Johnson*, 554 S.W.2d 775, 781 (Tex.Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.).

■ The separation of powers clause requires that the standards of delegation be "reasonably clear and hence acceptable as a standard of measurement." *Jordan v. State Bd. of Ins.*, 334 S.W.2d at 280. Criteria of the sort suggested by appellants would tend to reduce the precision of the standards, making the Commissioner's role *more* legislative in character, not less. Thus, whether or not such additional criteria would be beneficial, they are not required by article II, section 1.

### F. *Judicial review*

■ Both the Carrollton–Farmers Branch appellants and the Sterling City appellants challenge two provisions in Senate Bill 7 that limit judicial review of decisions by the Commissioner of Education. The majority of the Commissioner's decisions under

Chapter 36 may be appealed to a district court in Travis County. *See* TEX.EDUC.CODE §§ 11.13(c), 36.011(a). Senate Bill 7 provides, however, that an order issued by the Commissioner under Chapter 36 "shall be given immediate effect and may not be stayed or enjoined pending any appeal." TEX.EDUC.CODE § 36.011(b). Additionally, the Commissioner's decisions regarding involuntary detachment and annexation are "final and not appealable." TEX.EDUC.CODE § 36.213.

The Carrollton–Farmers Branch appellants assert that section 36.011(b) violates article V, section 8 of the Texas Constitution, which grants district courts the power to issue writs necessary to enforce their jurisdiction. With regard to section 36.213, the individual Carrollton–Farmers Branch appellants assert that foreclosing review of detachment and annexation decisions violates due process. Additionally, the Sterling City appellants argue that Senate Bill 7's denial of access to the courts violates the open courts guarantee in article 1, section 13 of the Texas Constitution.

All of these arguments are premature. The appellants do not attack any existing order of the Commissioner. When the Commissioner does act, the availability of judicial review is dependent on whether the Commissioner's decision affects vested property rights or violates a constitutional provision. *See City of Amarillo v. Hancock*, 150 Tex. 231, 239 S.W.2d 788, 790 (1951); *see also Lyford Indep. Sch. Dist. v. Willamar Indep. Sch. Dist.*, 34 S.W.2d 854, 856 (Tex.Comm'n App.1931, judgm't adopted) (holding that a school district has no vested right in laws fixing its boundaries). While it is possible that sections 36.011(b) or 36.213 might eventually be invoked, that possibility is too remote to warrant judicial resolution of the appellants' complaints at this stage. There is no suggestion that these provisions limiting judicial review are critical to the effective operation of Senate Bill 7. Thus, if the appellants' arguments are ultimately accepted, the provisions could simply be stricken.

---

**24.** We note, however, that any rules promulgated "must be consistent with the Constitution and Statutes of this State." *Gerst v. Oak Cliff Sav. & Loan Ass'n*, 432 S.W.2d 702, 706 (Tex.1968).

*See generally* TEX.GOV'T CODE § 311.032 (addressing the severability of statutes).

### G. *Impairment of contracts*

■ The Carrollton–Farmers Branch appellants also argue that Senate Bill 7 unconstitutionally impairs the obligation of contracts. Under the bill, when a property-rich district fails to reduce its taxable property to $280,000 per student, the Commissioner of Education must detach property from the district and annex it to another district. TEX. EDUC.CODE §§ 36.205, .206. Any property so detached is "released from the obligation for any tax to pay principal and interest on bonds authorized by the district before detachment." TEX.EDUC.CODE § 36.212. The Carrollton–Farmers Branch appellants assert that the threat of this procedure creates a danger that insufficient funds will be available to meet the district's outstanding bonded indebtedness. This danger, the appellants argue, impairs the district's ability to repay its obligations, in violation of the Texas and United States Constitutions. *See* TEX. CONST. art. I, § 16; U.S. CONST. art. I, § 10.

This Court has held that when the Legislature provides for the creation of a certain fund for the payment of a bond issue, the provision "cannot be repealed by subsequent legislation without the substitution of something of equal efficacy." *City of Aransas Pass v. Keeling*, 112 Tex. 339, 247 S.W. 818, 821 (1923). A lower court has applied this rule to strike down a six-percent limitation on a city's annual tax increases, because such a limitation increased the likelihood that the city's tax rate would be insufficient to meet its debt service requirements. *Determan v. City of Irving*, 609 S.W.2d 565, 570 (Tex.Civ. App.—Dallas 1980, no writ).

■ The rule stated in *Keeling*, however, does not prohibit every act affecting a bond-issuing entity's ability to repay its obligations; rather, it proscribes the unmitigated *repeal* of a funding source. As long as the

entity is clearly able to repay its obligations within statutory and constitutional limitations, legislation reducing the entity's tax base does not impair the obligation of contracts. *See Lyford Indep. Sch. Dist. v. Willamar Indep. Sch. Dist.*, 34 S.W.2d 854, 856 (Tex.Comm.App.1931, judgm't adopted); *El Dorado Indep. Sch. Dist. v. Tisdale*, 3 S.W.2d 420, 422 (Tex.Comm'n App.1928, judgm't adopted). We disapprove any suggestion in *Determan* that is inconsistent with our holdings in *Lyford* and *El Dorado*.

Senate Bill 7 poses no serious threat to any district's ability to repay its bonded indebtedness. Section 36.205 prohibits the Commissioner from detaching property in a manner that would reduce a district's wealth per student to less than $270,000 ($10,000 below the equalized wealth level). TEX.EDUC. CODE § 36.205. The record reflects that the vast majority of students in this state reside in districts with wealth well below $270,000 per student; and many of these districts have debt service requirements exceeding those of the wealthiest districts. Absent any showing that section 36.212 may actually render a district unable to meet its obligations, we hold that Senate Bill 7 does not unconstitutionally impair the obligation of contracts.

### H. *Noncontiguity*

■ The Carrollton–Farmers Branch appellants and the Sterling City and Crockett County appellants complain of several provisions in Senate Bill 7 under which a school district may include property that is not contiguous to the remainder of the district. These provisions, the appellants argue, violate the Legislature's obligations under article VII, sections 1 and 3 of the Texas Constitution.

The appellants' complaints are directed primarily at the mandatory actions to be taken when a property-rich district fails to reduce its wealth to $280,000 per student.[25] When the Commissioner of Education de-

---

25. The Carrollton–Farmers Branch appellants also note that Senate Bill 7 eliminates the long-standing requirement that voluntarily-consolidating districts be contiguous. See S.B. 7, 73rd Leg., R.S., ch. 347, § 8.26, 1993 Tex.Gen.Laws 1479, 1552 (amending TEX.EDUC.CODE § 19.051(a)); *see also* TEX.EDUC.CODE § 36.032

(consolidated district is governed by applicable provisions of the Education Code governing consolidation, "other than a provision requiring consolidating districts to be contiguous"). The appellants do not make any independent complaint regarding the constitutionality of this change.

taches property from such a district, the property detached "may be annexed to a school district without regard to whether the property is contiguous to other property in that district." Tex.Educ.Code § 36.206(b).[26] Similarly, when the Commissioner orders consolidation of districts to achieve the $280,000 wealth level, the district to be consolidated with the property-rich district must be chosen according to criteria that give priority to contiguous districts, but do not absolutely require contiguity. Tex.Educ.Code § 36.252.[27]

The appellants assert that these procedures are inherently inefficient because they preclude consideration of the educational effects of proposed boundary changes, and will produce a "crazy-quilt" pattern of districts across the state. In rural areas, the appellants argue, the practical effects will be particularly harsh; islands of property may be annexed to districts hundreds of miles away, undermining the ability of property owners and elected officials to participate in school affairs. In the appellants' view, article VII, section 1 requires contiguous districts, or at least requires that educational effects be considered in the creation of noncontiguous districts. Sterling and Crockett also argue that the noncontiguous districts permitted by Senate Bill 7 are inconsistent with the very concept of a "district" as that term is used in article VII, section 3.

In a related argument, Sterling and Crockett urge that the provisions at issue are invalid as applied to countywide school districts. They point out the constitutional significance of the county unit in various areas, including education, and argue that article VII, section 3 prohibits the formation of districts embracing an entire county and a portion or all of another county.

We note, initially, that a district may avoid all of the problems described by exercising one of the five options to reduce its wealth to $280,000 per student.[28] Presumably, the district will weigh the costs of the various alternatives, and will subject itself to mandatory detachment only if that alternative would be less damaging to the district than any of the five options.

There is still the danger that owners of valuable property will prefer one of the five options, but will be outvoted by others in the district. Parcels of property might consequently be detached from the district and annexed to distant, noncontiguous districts. As the appellants point out, such an arrangement would produce a crazy-quilt pattern of districts and could pose a number of practical problems.

 In constitutional terms, however, such an arrangement would not be significantly different from the present system. As recently as *Edgewood III*, we noted that "the crazy-quilt pattern of small school districts remains a significant feature of the Texas public education system." 826 S.W.2d at 495. There is little indication that this pattern was created on the basis of educational considerations. *See Edgewood I*, 777 S.W.2d at 393.

**26.** The criteria for annexation give first priority to districts in the same county, and second priority to districts served by the same Regional Service Center. *See* Tex.Educ.Code § 36.206(d). Testimony at trial indicated, however, that property could be annexed to districts as much as 500 miles away.

**27.** Section 36.252(a) instructs the Commissioner to give priority to school districts in the following order:

(1) first, to the contiguous district that has the lowest wealth per student and is located in the same county;

(2) second, to the district that has the lowest wealth per student and is located in the same county;

(3) third, to a contiguous district with a property wealth below the equalized wealth level that has requested the commissioner that it be considered in a consolidation plan;

(4) fourth, to include as few districts as possible that fall below the equalized wealth level within the consolidation order that have not requested the commissioner to be included;

(5) fifth, to the district that has the lowest wealth per student and is located in the same regional education service center area; and

(6) sixth, to a district that has a tax rate similar to that of the district that has a property wealth greater than the equalized wealth level.

**28.** The record reflects, in fact, that at the time of trial all of the districts above the $280,000 level had successfully exercised some combination of these options, so the provisions challenged here have not yet been invoked against any school district.

We have never held, however, that the arbitrary creation of school districts is itself a constitutional violation; on the contrary, we have consistently held that the Texas Constitution "invests the Legislature with plenary power with reference to the creation of school districts." *Terrell v. Clifton Indep. Sch. Dist.*, 5 S.W.2d 808, 810 (Tex.Civ.App.—Waco 1928, writ ref'd); *see also Edgewood III*, 826 S.W.2d at 510–11. Nor have we construed the term "district" to impose a requirement of contiguity. Not all of the State's *judicial* districts are contiguous, even though the Constitution provides that "the State shall be divided into as many judicial districts as may now or hereafter be provided by law." TEX. CONST. art. V, § 7. We decline to hold that the noncontiguity provisions of Senate Bill 7 offend either section 1 or section 3 of article VII.

■ There is presently no constitutional basis for reaching a different result with regard to countywide school districts. At one time, this Court did hold that article VII, section 3 prohibited the creation of school districts that crossed county lines. *Parks v. West*, 102 Tex. 11, 111 S.W. 726, 727 (1908). That holding led to an amendment to article VII, section 3 permitting the formation of districts "composed of territory wholly within a county or in parts of two or more counties." *See Edgewood III*, 826 S.W.2d at 505 (quoting Tex.H.R.J.Res. 6, 31st Leg., R.S., 1909 Gen.Laws 251). There is no facial inconsistency between this language and the noncontiguity provisions of Senate Bill 7. While the quoted language could call into question some actions permitted by Senate Bill 7—such as the consolidation of two whole-county districts—there is no indication in the record that any such actions are contemplated or likely, and we do not address them today.

### I. Situs rule

■ Sterling and Crockett also challenge Senate Bill 7's detachment and annexation provisions on the basis of article VIII, section 11 of the Texas Constitution, which generally requires that taxes on property be paid "in the county where situated."[29] According to the appellants, this provision establishes that the situs of real property for purposes of taxation is the county where the property is physically located. Senate Bill 7 violates this rule, the appellants argue, because it permits a taxing authority to tax real property that is outside of its boundaries.

Under article VII, section 3 of the Constitution, the Legislature may establish school districts that "embrace parts of two or more counties," and may provide for the assessment and collection of taxes in those districts, "whether such districts are composed of territory wholly within a county or in parts of two or more counties." A school district may therefore tax real property that is located within its district boundaries, even if that district encompasses parts of more than one county.

Under Senate Bill 7, detached real property is deemed to be placed within the district to which the property is annexed. When this occurs, the taxable situs of the property attached is within the limits of the taxing district's boundaries. We hold, therefore, that the detachment and annexation provisions of Senate Bill 7 do not violate article VIII, section 11.

### J. Voting Rights Act and Equal Protection Clause

■ The Carrollton–Farmers Branch appellants argue that Senate Bill 7 violates the federal Voting Rights Act, 42 U.S.C. §§ 1971(b) and 1973i(b), because it is an attempt to intimidate, threaten, or coerce citizens for the purpose of interfering with their right to vote.[30] The appellants presented

---

**29.** The full text of article VIII, section 11 is as follows:

All property, whether owned by persons or corporations shall be assessed for taxation, and the taxes paid in the county where situated, but the Legislature may, by a two-thirds vote, authorize the payment of taxes of non-residents of counties to be made at the office of the Comptroller of Public Accounts. And all lands and other property not rendered for taxation by the owner thereof shall be assessed at its fair value by the proper officer.

**30.** The Carrollton–Farmers Branch appellants also bring a related challenge against Senate Bill 7's provisions for tax base consolidation (option 5). Under those provisions, the consolidated taxing district is governed by the boards of the

testimony from individuals to the effect that they did not wish to vote for any of the five options in Senate Bill 7, but were coerced to do so to avoid mandatory detachment or consolidation.

The Sterling City and Crockett County appellants assert numerous related challenges involving Senate Bill 7's involuntary detachment and annexation provisions. All of these challenges concern the possibility that residential property may be annexed to a distant district. The appellants assert that such annexation would violate the rights of voters, candidates, students, parents, and taxpayers residing on the annexed property.

We reject the argument that Senate Bill 7 is an unlawful attempt to interfere with the right to vote. As indicated previously, the Texas Constitution gives the Legislature a "free hand" in establishing school districts, "including the abolition and consolidation of districts." *Edgewood III*, 826 S.W.2d at 511. Far from interfering with the right to vote, Senate Bill 7 provides an opportunity to vote that would not otherwise exist.

■ We likewise reject the argument that Senate Bill 7, on its face, violates the rights of individuals residing on property that may be detached. Senate Bill 7 exempts from involuntary detachment property used primarily for residential purposes. Tex.Educ.Code § 36.203(a).[31] It is still possible that property with residents may be

detached; but Senate Bill 7 seeks to minimize the impact of any such detachment by providing that students residing on the detached property "may choose to attend school in that district or in the district to which the property is annexed." Tex.Educ. Code § 36.211. While these provisions do not necessarily foreclose all constitutional challenges, any such challenges remaining are too remote and too fact-dependent to be resolved in the abstract.

### K. Local or special law

■ Finally, the Carrollton–Farmers Branch appellants argue that Senate Bill 7 is a local or special law in violation of article III, section 56 of the Texas Constitution.[32] The appellants point out that in 1993–94, only 99 out of the 1,052 school districts in the state were required to choose among the five options to reduce their wealth.

■ A special or local law is one that applies to a limited class of persons as distinguished by geography or some other special characteristic. *Edgewood III*, 826 S.W.2d at 510 (citing *Clark v. Finley*, 93 Tex. 171, 54 S.W. 343, 345 (1899)). The ultimate test for determining whether a law is general or special is whether there is a reasonable basis for the classification it makes and whether the law operates equally on all members within the class. *Robinson v. Hill*, 507 S.W.2d 521, 525 (Tex.1974).

component school districts acting jointly, and any action taken by the joint board must receive a favorable vote of a majority of each district's board of trustees. Tex.Educ.Code § 36.156. The appellants assert, without explanation, that this system has a disparate impact on minorities because it limits participation and constitutes unfair representation. The appellants offer no authority for this argument; nor do they explain whose participation would be limited, or who would be unfairly represented. In the absence of any relevant argument or authorities, this issue is not adequately presented for review.

31. This section provides that only the following property may be detached and annexed:
(1) a mineral property;
(2) real property used in the operation of a public utility, including a pipeline, pipeline gathering system, or railroad or other rail system; and
(3) real property used primarily for industrial or other commercial purposes, other than

property used primarily for agricultural or for residential purposes.
Tex.Educ.Code § 36.203(a).

32. In particular, the appellants rely on the following passages:

The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law, authorizing:
The creation, extension or impairing of liens;
Regulating the affairs of counties, cities, towns, wards or school districts;
. . . .
Regulating the management of public schools, the building or repairing of school houses, and the raising of money for such purposes;
. . . .
And in all other cases where a general law can be made applicable, no local or special law shall be enacted. . . .
Tex. Const. art. III, § 56.

Senate Bill 7, like Senate Bill 351, applies generally to the entire state. The fact that only 99 districts were required to reduce their taxable property this year does not make the law special or local. *See Robinson,* 507 S.W.2d at 525 (upholding classification applying at that time to only eleven counties); *Smith v. Davis,* 426 S.W.2d 827, 831–32 (Tex.1968) (upholding classification applying to only two county hospital districts). The classification made by Senate Bill 7 is obviously related to the purposes of the Bill, and the law operates equally on all members within the class. Accordingly, we hold that Senate Bill 7 is not a local or special law within the prohibition of article III, section 56.

## V

Article VII, section 1 of the Texas Constitution commands the Legislature to suitably provide for an efficient system of public schools. Implicit in this command is the State's duty to provide all districts with substantially equal access to the operations and facilities funding necessary for a general diffusion of knowledge. *See Edgewood I,* 777 S.W.2d at 397. The Edgewood and Alvarado appellants argue that the absence of a separate facilities component in Senate Bill 7 compels the conclusion that the Legislature has failed to provide efficiently for facilities. Indeed, the evidence at trial shows that the lack of a separate facilities component has the potential of rendering the school finance system unconstitutional *in its entirety* in the very near future. However, under this record, we have no alternative but to conclude that plaintiffs have not met their burden to prove that Senate Bill 7 fails to provide efficiently for facilities. Accordingly, we reverse that part of the district court's judgment that enjoined the issuance of bonds after September 1, 1995.

Although there is no "separate" facilities component, all districts have access to equalized funding for facilities purposes under Tier 2. Tier 2 was designed to provide "a guaranteed yield system of financing to provide all districts with substantially equal access to funds to provide an enriched program and *additional funds for facilities.*" TEX. EDUC.CODE § 16.002(b) (emphasis added). The only question before us is whether the record shows that districts cannot meet their operations and facilities needs for a general diffusion of knowledge from the funding available under Tier 2. The evidence adduced at trial shows that the poorest districts in the State must levy a maintenance and operations tax of approximately $1.31 to provide the operations revenue necessary for a general diffusion of knowledge.[33] However, equalized access under Tier 2 is afforded up to a tax rate of $1.50.

The plaintiffs offered in evidence a 1992 Texas Education Agency report, which generally concluded that the facilities in property-poor districts are older and in greater need of repair. But the report also concludes that "more than 90% of all districts statewide received average ratings of fair or good for their rooms and building systems."[34]

The plaintiffs further point to the fact that debt service rates in property-poor districts are generally higher than those in property-rich districts. Debt service taxes in the property-poor districts, however, generate far more revenue than required for actual debt service allocations, which leaves the districts with a considerable amount of revenue available for either facilities or operations purposes.[35] Our search of the record reveals that the plaintiffs have not demonstrated that there is even one district that cannot presently provide the facilities necessary for a general diffusion of knowledge within the equalized program. To the contrary, the

---

**33.** *See supra* n. 12.

**34.** The report itself cautions, however, that "to attempt to use [its] data for anything other than a general analysis would be inappropriate and could be misleading."

**35.** This excess revenue is produced because the property-poor districts continue to levy a debt service tax that is based on their property wealth without consideration of revenue from state equalization. The average debt service tax rate of $0.33 in the lowest wealth districts produced approximately five times the amount of revenue necessary to service the debt.

undisputed evidence is that all districts can presently meet their operations and facilities needs with funding provided by Tier 2.[36]

We acknowledge, and the State concedes, that if the cost of providing a general diffusion of knowledge rises to the point that a district cannot meet its operations and facilities needs within the equalized program, the State will, at that time, have abdicated its constitutional duty to provide an efficient school system. *See supra* notes 10 and 14. From the evidence, it appears that this point is near.[37] However, under the present record, plaintiffs have not yet proved that the State has breached its duty to efficiently provide for a general diffusion of knowledge simply because Senate Bill 7 does not include a separate facilities component.

## VI

Another group of appellants includes Guadalupe and Margie Gutierrez, individually and as next friends of their two minor children, along with two other sets of parents and children. As plaintiff-intervenors in the district court, the Gutierrez group alleged that the present system of public education denies them a constitutionally suitable and efficient education. They further alleged a constitutional right to select the schools of their choice and to receive state reimbursement for their tuition. Thus, they sought an immediate remedy ordering their school districts to contract with private entities of the parents' choosing for the education of their children.

The State filed special exceptions to the petition in intervention, asserting, among other things, that it "prays for a political remedy rather than alleging a statutory or constitutional right." At a hearing, the district court stated that it was granting the State's special exceptions, and explained its ruling as follows:

What I am saying is, is that the courts of the State of Texas have no authority to order a hybrid voucher system.

And it doesn't matter what state of facts you show with regard to suitability or efficiency, that we have got no authority to order a hybrid voucher system. And that that's what you are requesting and we have got no authority to do it.

After providing an opportunity to amend the petition, the district court dismissed the claims with prejudice.

The Gutierrez appellants assert that the district court erred in sustaining the special exceptions because the petition in intervention asserted justiciable claims. We disagree.

In *Edgewood I,* we held that article VII, section 1 provides "a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions." 777 S.W.2d at 394. The Constitution gives to the Legislature, however, the "primary responsibility to decide how best to achieve an efficient system." *Id.* at 399. Since then, we have consistently refrained from prescribing "the means which the Legislature must employ in fulfilling its duty." *Edgewood II,* 804 S.W.2d at 498. Most recently, we explained our role as follows:

[W]e do not prescribe the structure for "an efficient system of public free schools." The duty to establish and provide for such a system is committed by the Constitution

---

**36.** This conclusion is supported by our observation that the property-poor districts' total tax rates at the time of trial were, for the most part, well beneath the maximum allowable rate. Indeed, as the State notes, 96.5% of all funds used for the repayment of construction bonds are within the $1.50 effective tax rate.

**37.** We acknowledge the Legislature's recent efforts to this end. *See* REPORT OF THE SENATE INTERIM COMMITTEE ON SCHOOL FACILITIES (1994). By vacating the district court's injunction, we do not imply that the system financing facilities is now and will continue to be constitutionally efficient. The districts must have substantially equal access

to the funding for a general diffusion of knowledge for both operations and facilities needs. If the Legislature abdicates its duty with respect to either of these needs, we will have no choice but to hold that the school finance system is unconstitutional in its entirety. Any such future determination would not, however, affect the districts' authority to levy the taxes necessary to retire previously issued bonds, but would, instead, require the Legislature to cure the system's unconstitutionality in a way that is consistent with the contract clauses of the U.S. and Texas Constitutions. *See* U.S. CONST. art. I, § 10; TEX. CONST. art. I, § 16.

748

to the Legislature. TEX. CONST. art. VII, § 1. Our role is only to determine whether the Legislature has complied with the Constitution.

*Edgewood III,* 826 S.W.2d at 523. The Gutierrez appellants now ask the Court to go beyond this role, and to prescribe the structure of this state's public school system. For the reasons stated in our prior opinions, we decline to do so.

## VII

In a separate proceeding, Somerset Independent School District and ten other school districts brought suit challenging a rule issued by the Commissioner of Education regarding the redistribution of certain funds held by CEDs. The district court consolidated the suit with those brought by the other districts, and subsequently upheld the Commissioner's rule. We affirm.

The parties stipulated to the relevant facts. Senate Bill 351 required each CED to levy a tax at a rate necessary to collect its local fund assignment. The CED was then to distribute the funds collected to the CED's component school districts pursuant to a statutory formula. When the total amount available for distribution by the CED exceeded its local fund assignment, the CED was required to retain the excess amount for distribution in succeeding years. After Senate Bill 351 took effect, some CEDs had excess funds, some had no excess, and some a deficit.

In January 1992, this Court held Senate Bill 351 invalid, but we deferred the effect of our ruling so as not to interfere with the collection of 1991 and 1992 CED taxes. *Edgewood III,* 826 S.W.2d at 522. We noted

that our ruling was not to be used as a defense to the payment of any such taxes. *Id.*

Senate Bill 7 abolished the CEDs created by Senate Bill 351. Section 4.15 of the Bill provided for the wind-up of CEDs.[38] The section required each CED to transfer its funds to its component school districts on August 31, 1993, "in the manner provided by rule of the commissioner of education." § 4.15(a). It also authorized school districts to "collect and use or distribute" delinquent CED taxes in the manner provided by the Commissioner. § 4.15(e).

Pursuant to section 4.15, the Commissioner of Education adopted a rule providing for the management of assets, liabilities, and records of former CEDs. 19 TEX.ADMIN.CODE § 61.1001. One section of the rule provided that funds were to be distributed according to each school district's reduction in revenues between the 1992–93 school year and the 1993–94 school year. *Id.* § 16.1001(b)(3). In other words, those districts that lost the most revenue in the transition from Senate Bill 351 to Senate Bill 7 would receive the largest share of excess CED funds and delinquent taxes. Because of this rule, the Somerset school districts have received a smaller amount of excess funds and delinquent taxes than they would have received if those moneys had been transferred to school districts under the Senate Bill 351 formula upon which CED Tier 1 funds were distributed.

The Somerset districts challenge the rule's provisions regarding excess funds, delinquent taxes, and the designation of successors-in-interest. We consider each in turn.

**38.** The full text of § 4.15 is as follows:

(a) On August 31, 1993, each county education district shall transfer its funds to its component school districts in the manner provided by rule of the commissioner of education, except any penalties paid to a county education district in 1993 shall be allocated to the school district that is the situs of the property that incurred the penalties.

(b) On September 1, 1993, any assets of a county education district other than funds are transferred to its component school districts in the manner and amounts provided by rule of the commissioner of education.

(c) On September 1, 1993, the contracts and other liabilities of a county education district

are transferred to its component school districts in the manner and amounts, including joint obligations, provided by rule of the commissioner of education.

(d) The records of the board of a county education district shall be maintained as provided by rule of the commissioner of education.

(e) The component school districts of a county education district abolished by this Act may collect and use or distribute taxes imposed by a county education district that are delinquent in the manner provided by rule of the commissioner of education.

S.B. 7, 73rd Leg., R.S., ch. 347, § 4.15, 1993 Tex.Gen.Laws 1479, 1526.

## A. *Excess CED funds*

 The Somerset districts argue that the Commissioner's rule is invalid because its provisions for the distribution of excess CED funds are inconsistent with, or contrary to, section 4.15 of Senate Bill 7.[39] The districts point out that section 4.15(a) requires the transfer of excess funds "in the manner" provided by the Commissioner, while section 4.15(b), which governs other assets, and section 4.15(c), which governs contracts and other liabilities, both require transfer "in the manner *and amounts*" provided by the Commissioner (emphasis added). We must presume, the districts argue, that the omission of the phrase "and amounts" in section 4.15 was deliberate. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981). According to the districts, the Legislature intended the excess funds to be transferred in the amounts determined by applying Senate Bill 351, because this Court's injunction allowed Senate Bill 351 to remain in place until September 1, 1993—the day after the excess funds were to be distributed. *See Edgewood III*, 826 S.W.2d at 523 n. 42.

We disagree. Although section 4.15(a) does not use the word "amounts," it clearly contemplates that the "manner provided" for the distribution of funds will include the determination of amounts because the latter part of the section sets out an exception for the allocation of penalties. If the Commissioner had no discretion regarding the determination of amounts, the restriction regarding penalties would not be an exception at all; it would be a wholly separate responsibility. The more plausible interpretation is that the Commissioner has discretion in adopting a rule for the allocation of excess funds among school districts, *except* that penalties must be allocated in the manner specified.

The other language in section 4.15 does not justify the Somerset districts' reading of the statute. The words "and amounts" were apparently included in paragraphs (b) and (c) to clarify that the Commissioner was authorized to determine the value of all items transferred. Non-monetary assets, contracts, and other liabilities may lack clear monetary values—unlike funds, which are necessarily expressed in dollar amounts. In regard to the date specified for the transfer of funds, the statute must be read in light of the immediately preceding provision, section 4.14 of Senate Bill 7, which abolished every CED effective September 1, 1993. Section 4.15(a) simply provides that the last act required of CEDs—the transfer of their funds—was to take place on the last day of their existence.

## B. *Delinquent CED taxes*

 The Commissioner's rule required the governing board of each CED to designate a successor-in-interest to the assets, liabilities, and records of the CED. 19 TEX.ADMIN.CODE § 16.1001(a). The successor-in-interest is charged with collecting all delinquent taxes of the CED, including any accrued but unpaid penalties and interest, and distributing the amounts collected in the same manner provided for excess CED funds. *Id.* § 16.1001(c). The Somerset districts argue that these rule provisions are inconsistent with, or contrary to, the policy and standards of Senate Bill 7. Alternatively, the Somerset districts argue that the provisions were promulgated pursuant to a delegation of legislative authority that provided constitutionally insufficient standards for rulemaking.

The terms of section 4.15 do give the Commissioner broad discretion in adopting a rule. That discretion is limited, however, by other provisions concerning state policy with regard to school finance. In particular, the

---

**39.** The State argues that this issue is not properly before the Court because a direct appeal is allowed only from an order granting or denying an injunction "on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c). The State does not dispute, however, that this Court has direct appeal jurisdiction over Somerset's related argument, discussed *infra*, that section 4.15 is an unconstitutional delegation of authority. When this Court has appellate jurisdiction of any issue, it acquires "extended jurisdiction" of all other questions of law properly preserved and presented. *City of Corpus Christi v. Public Util. Comm'n*, 572 S.W.2d 290, 294 (Tex.1978). Accordingly, we hold that all of the Somerset districts' arguments are properly before the Court.

State points to the following statutory language, which was reenacted by Senate Bill 7:

> The public school finance system of the State of Texas shall adhere to a standard of neutrality which provides for substantially equal access to similar revenue per student at similar tax effort, considering all state and local tax revenues of districts after acknowledging all legitimate student and district cost differences.

TEX.EDUC.CODE § 16.001(b). The Commissioner's action in adopting the rule is consistent with the policy set out in this section. By easing the transition to Senate Bill 7, the Commissioner's rule promotes the goal of substantially equal access to similar revenue per student at similar tax effort. We hold, therefore, that the Commissioner's rule regarding delinquent taxes is not inconsistent with, or contrary to, the policy and standards of Senate Bill 7.

■ We likewise hold that section 4.15 does not represent an unconstitutional delegation of legislative authority. Section 16.001 establishes a reasonable standard to guide the Commissioner, and thus sufficiently limits the Commissioner's discretion. *See Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992).

### C. *CEDs' successors-in-interest*

■ Finally, the Somerset districts assert that the Commissioner's rule is invalid insofar as it required the governing board of each CED to designate a successor-in-interest. Noting that section 4.15 of Senate Bill 7 does not mention any successor-in-interest, the Somerset districts argue that the Commissioner's rule is invalid because it imposes

additional burdens, conditions, or restrictions in excess of the statute. *See generally Kelly v. Industrial Accident Bd.*, 358 S.W.2d 874, 876–77 (Tex.Civ.App.—Austin 1962, writ ref'd).

■ In deciding whether an administrative agency has exceeded its rulemaking powers, the determinative factor is whether the rule's provisions are in harmony with the general objectives of the act involved. *Gerst v. Oak Cliff Sav. & Loan Ass'n*, 432 S.W.2d 702, 706 (Tex.1968). The designation of successors-in-interest promotes the orderly winding-up of CEDs, as well as the other goals of Senate Bill 7, by allowing the State's interests to be protected after the CEDs are abolished. We hold, therefore, that the Commissioner did not exceed his rulemaking powers by enacting the rule.

### VIII

■ We conclude that Senate Bill 7 is constitutional in all respects. We also hold that the district court properly dismissed the Gutierrez group's claims and rejected the Somerset group's claims. Therefore, the judgment of the district court is modified to provide that the relief requested by Edgewood Independent School District, et al., and Alvarado Independent School District, et al. is denied.[40] The district court's injunction of January 26, 1994, is vacated. The judgment of the district court is in all other respects affirmed.

ENOCH, Justice, concurring and dissenting.

I agree with the Court today that Senate Bill 7 establishes an efficient system of public schools.[1] I also agree with the Court's anal-

---

**40.** The district court's judgment indicates that court's willingness to consider additional challenges in the event that any of the following occur:

1. S.B. 7 is repealed without a substitution that produces substantial equity;
2. S.B. 7 is amended in a manner that significantly reduces equity;
3. S.B. 7 is not sufficiently funded in future bienniums to produce substantial equity;
4. The $1.50 tax cap on the local M & O rate in S.B. 7 is abandoned or raised without a corresponding increase in the guaranteed equalized yield.

We nonetheless consider the district court's judgment to be a final judgment, and to the extent that any future trials on these issues are not altogether foreclosed, we trust such proceedings will be conducted in accordance with our judgment and opinion today.

**1.** I believe a credible argument can be made that the determination of what is an efficient, suitable educational system is a political question that this Court is ill-equipped to answer. *See Kirby v. Edgewood Indep. Sch. Dist.*, 761 S.W.2d 859, 867 (Tex.App.—Austin 1988), *rev'd*, 777 S.W.2d 391 (Tex.1989). That argument, however, was unanimously rejected by this Court. *Edgewood Indep.*

ysis that equalized funding is required only to the point that efficiency is achieved and that unequalized supplementation thereafter is constitutionally permissible. I further agree that the efficiency clause of article VII, section 1 contains a qualitative component and that efficiency must be measured not only by financial efficiency but also by its qualitative component. Therefore, I join in Parts I, II, and III of the Court's opinion. In my view, school facilities are an integral part of an efficient system of public schools. Thus, I firmly agree that the Court in Part V of its opinion is correct to apply the constitutional analysis to Senate Bill 7 in its entirety. The trial court erred in segregating its analysis of facilities and in enjoining the issuance of bonds by local districts.[2]

Yet while I agree that Senate Bill 7 is constitutionally efficient under article VII, section 1, I cannot join in that part of the Court's judgment upholding Senate Bill 7 because I find other constitutional infirmities in the legislation. In achieving efficiency, the State has so expanded its reliance on local property taxes to fund the entire public school system that the State has abdicated its constitutional duty to make suitable provision for public schools in violation of article VII, section 1 and has enacted a state ad valorem tax prohibited by article VIII, section 1–e. Consequently, I dissent.

## I. Historical Failings

The principal education clause of our Constitution mandates that the State establish and make suitable provision for our public schools:

> A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it **shall be the duty** of the Legislature of the State to **establish and make suitable provision** for the support and maintenance of an efficient system of public free schools.

TEX. CONST. art. VII, § 1 (emphasis added). Despite the direct constitutional mandate of

article VII, section 1, the State has an unfortunate history of failing to live up to its constitutional responsibilities. Senate Bill 7 is another chapter in that ill-distinguished history.

The burden placed on the State to provide for public education derives from the Constitution of the Republic of Texas of 1836:

> It shall be the duty of Congress, as soon as circumstances will permit, to provide by law a general system of education.

Constitution of the Republic of Texas, General Provisions § 5 (1836), *reprinted in* TEX. CONST. app. 482, 490 (Vernon 1993). Although over four million acres of land were set aside by the Legislature at that time to establish a primary school system, the Legislature never established any state-wide educational system. STEWART & CLARK, THE CONSTITUTION AND GOVERNMENT OF TEXAS 103 (1933); Stern, Comment, *Judicial Promulgation of Legislative Policy: Efficiency at the Expense of Democracy*, 45 Sw.L.J. 977, 981 (1991).

When Texas joined the Union in 1845, Texans adopted a new state constitution with a stronger education clause that called for preserving liberties through education:

> A general diffusion of knowledge being essential to the preservation of the rights and liberties of the people, it shall be the duty of the Legislature of this State to make suitable provision for the support and maintenance of public schools.

TEX. CONST. of 1845, art. X, § 1, *reprinted in* TEX. CONST. app. at 521. Again, the Legislature did not follow through on its constitutional obligations to public education and failed, until 1854, to establish a permanent school fund as required by article X, section 2 of the 1845 Constitution. Stern, *supra*, at 981. Even then, the first money invested in the permanent school fund, two million dollars, was subsequently loaned to the railroads. *See* FUNKHOUSER, EDUCATION IN TEXAS: POLICIES, PRACTICES, AND PERSPECTIVES 175 (6th Ed.1992); JOURNAL OF THE SECES-

---

*Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989) (*Edgewood I*). Therefore, we continue to try.

**2.** Also, I concur in the Court's disposition of the claims of the Gutierrez plaintiffs and Somerset

districts. Accordingly, I join in Parts VI and VII of the Court's opinion and in those portions of the Court's judgment.

SION CONVENTION OF 1861, at 160 (1912); Stern, *supra*, at 982. The loans were not repaid. Stern, *supra*, at 982.

Texans adopted our current Constitution after Reconstruction in 1876. Once more, Texans placed the burden on the State's Legislature to provide for the public schools. This time it was mandated that the State provide for the support and maintenance of an *efficient system* of public free schools.[3] TEX. CONST. art. VII, § 1.

Our current Constitution initially provided for only state funding of public education on a per student basis. TEX.CONST. art. VII, § 5. Interestingly, it did not permit local entities to levy local taxes for the support of the public schools.[4] *City of Fort Worth v. Davis*, 57 Tex. 225, 232 (1882). The State's funding remained inadequate, however, and by 1883 Texans adopted an amendment to the Constitution that authorized the creation of local school districts and permitted all school districts to levy an "additional" property tax for the support of public schools.[5]

TEX.CONST. art. VII, § 3. Since that time, the State has steadily shifted its constitutional obligation to provide for public schools to local property taxes and, as a result, has not only abdicated its constitutional responsibilities, but has struggled with equalizing the disparities created by that system.[6]

The State's lackluster commitment to provide for the public schools is borne out by the numbers. Under the first comprehensive attempt at school finance reform in 1949, the Legislature established the Minimum Foundation Program, the predecessor of our current Foundation School Program, envisioning a guaranteed amount of resources per student with the State funding 80% and local taxes funding only 20%. *Edgewood III*, 826 S.W.2d at 495. Under this system, however, local districts were not required to raise any local funds to receive state funding for education. *Id.* at 496. By the mid–1980's, state funding of the total educational costs had dwindled to only 42%, with local property taxes accounting for 50% and the remainder

---

3. The Constitution of 1876 was adopted in response to the Radical Reconstruction period in Texas. Radical Reconstruction after the Civil War brought Texas a militaristic school system with the State exercising absolute authority over the training of Texas children. *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989) (*Edgewood I*). The Constitution of 1869 continued to place the burden on the State to provide for the support and maintenance of a system of "public free schools." TEX. CONST. of 1869, art. IX, § 1, *reprinted in* TEX. CONST. app. at 612. This system was funded by the permanent school fund, poll taxes, general taxes, and local taxes. STEWART & CLARK, *supra*, at 104; Stern, *supra*, at 983 (1991). The system proved to be expensive and financially ruinous for the State. Stern, *supra*, at 983.

4. However, article XI, section 10 of the Constitution did permit incorporated cities to levy local taxes to supplement state funds provided for public education. *Davis*, 57 Tex. at 234.

5. Article VII, section 3 provides in pertinent part:

[T]he Legislature may also provide for the formation of school district [sic] by general laws; and all such school districts may embrace parts of two or more counties, and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, ... and the Legislature may authorize an *additional ad valorem tax* to be levied and

collected within all school districts heretofore formed or hereafter formed, for the *further maintenance* of public free schools, and for the erection and equipment of school buildings therein....

TEX. CONST. art. VII, § 3 (emphasis added). With the 1883 amendment, article VII, section 3 provided for a state property tax to maintain and support public schools, hence the reference in that provision to an "additional" local property tax. The state property tax ultimately was abolished by constitutional amendment in 1968. TEX. CONST. art. VIII, § 1–e.

6. By 1915, disparities in local tax resources had grown such that the Legislature made a special appropriation of equalization aid for rural school districts that were already taxing at the maximum legal rate. Act of May 26, 1915, 34th Leg., 1st C.S., ch. 10, 1915 Tex.Gen.Laws 22. Noting the disparities in local taxable wealth, the Court rejected challenges to this rural equalization aid in *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 36 (1931), finding authority for such aid in article VII, section 1. The disparities have continued to this day resulting in five legal challenges to the State's financing system, including the present challenge, in the last twenty-two years. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489 (Tex. 1992) (*Edgewood III*); *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex.1991) (*Edgewood II*); *Edgewood I*, 777 S.W.2d 391.

of funding provided by other outside sources. *Edgewood I*, 777 S.W.2d at 392.

Senate Bill 7 is merely the same song, second verse. As has been the case for nearly 150 years, the State again has failed to adequately provide for the State's public schools. The evidence is undisputed that the State's Tier 1 funding, the $2,300 basic allotment, is insufficient for districts to provide a basic program of education that meets accreditation and other legal standards. *See* Tex.Educ.Code § 16.002(b).[7] Not only is it insufficient, but the basic allotment under Senate Bill 7 is less than was provided under Senate Bill 351. At every turn, the Legislature appears to be going backward and not forward.

More troublesome than the State's failure to adequately fund a basic program of education, however, is the State's reliance on and manipulation of local property taxes under the current system. Under Senate Bill 7, local property taxes continue to be the cornerstone of the State's educational financing system with the State contributing only 43% of the funding for our public schools. Unlike prior financing schemes, Senate Bill 7 attempts to mask the State's failure to adequately fund education by increasing the system's reliance on local property taxes and then capturing those dollars under the guise of state funding. This unprecedented reliance on local property taxes under Senate Bill 7 renders the school finance system unconstitutional.

## II. Unsuitability

The Court today reconfirms that suitability under article VII, section 1 is a justiciable issue. 917 S.W.2d at 735–37; *Edgewood I*, 777 S.W.2d at 394. However, the Court effectively precludes any judicial review of suitability by giving the Legislature the virtually unfettered discretion to implement school financing schemes. The Court notes only that if the Legislature "substantially defaulted on" its responsibility to provide for education

would the suitability clause be violated. 893 S.W.2d at 470. Because state funding has increased from $4.9 billion in 1988–89 to $7.2 billion in 1993–94, the Court refuses to otherwise examine the suitability of Senate Bill 7 in light of the constitutional mandate of article VII, section 1. Apparently, the Court believes there would be some point at which the total state dollars are so inadequate as to amount to a "substantial default" of the State's responsibility to fund education, but the Court does not indicate what that point is. Assuming that the State will always spend billions of dollars on education, today's decision renders the suitability clause meaningless.

By reducing the constitutional standard of suitability to total dollars spent, the Court has not only rendered that provision meaningless, but has also misconstrued the object of our review. The duty to establish and suitably provide for an efficient system of public schools is committed by the Constitution to the Legislature. *Edgewood III*, 826 S.W.2d at 489. Our role is to determine whether the Legislature has complied with that duty. *Id.* Thus, our responsibility is to review the financing scheme in its entirety and determine whether the State has fulfilled its constitutionally mandated duty to suitably provide for the system of public schools. The Court's analysis of suitability, focusing solely on total dollars spent, ignores the substantive provisions of the financing scheme enacted under Senate Bill 7.

Suitability, we have said, is an elastic term, depending upon the necessities of changing times or conditions. *Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 36 (1931). The constitutional obligation to suitably provide for public schools leaves to the Legislature the right to determine what is suitable; its determination will not be reviewed by the courts if the act has a real relation to the subject and object of the Constitution. *Id.* This standard of suitability gives the Legislature broad discretion, but limits that discretion by requiring a real relationship between the fi-

---

7. For the 1993–94 school year, the Commissioner of Education recommended and sought from the Legislature an appropriation of $8.683 billion. Tex.Educ.Agency, Requests for Legislative Appropriations for Fiscal Years 1994 and 1995, at 3

(1992). The Legislature declined to fully fund Senate Bill 7 appropriating only $7.2 billion. Act of May 27, 1993, S.B. 5, art. III, 73rd Leg., R.S., ch. 1051, 1993 Tex.Gen.Laws 4518, 4988.

nance system and the subject and object of the Constitution. The Court cites to *Mumme* in passing but otherwise ignores this standard without explanation.

To determine suitability first requires us to identify the basic educational program prescribed by the State as "essential" to the "general diffusion of knowledge." We must then examine the scheme established by the State under Senate Bill 7 to suitably provide for the basic education program and determine if the financing system has a real relationship to the constitutional mandate. Reviewed accordingly, the financing scheme enacted under Senate Bill 7 fails to satisfy the suitability clause of article VII, section 1 because it shifts the burden to provide for the State's public school system to local taxpayers.

The basic program of education prescribed by the State as essential is represented by Tier 1. Tier 1 purportedly guarantees sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards. TEX.EDUC.CODE § 16.002(b). Tier 2, the Guaranteed Yield Program, is designed to provide all districts with substantially equal access to funds to provide an enriched program and additional funds for facilities. *Id.* § 16.002(b). Unlike Tier 1, the State has provided Tier 2 funding to give all districts the opportunity to *supplement* the basic program at a level of its own choosing and to provide access to *additional* funds for facilities. *Id.* § 16.301.

Tier 1 represents the constitutionally minimum basic education program required by article VII, section 1 of the Constitution. Rather than fund what it has stated is the basic minimum educational program, however, the State has left Tier 1 to be funded first by local districts through local property tax-

es. Specifically, to receive *any* state funds under the Foundation School Program, all local districts must levy a Tier 1 tax of at least $.86 to attempt to raise the basic allotment of $2,300 per weighted student. TEX. EDUC.CODE § 16.252(a), (d). Thus, in all districts, the local district must generate and spend its local tax dollars first to fund the basic program of education that the State is required to provide by statute and article VII, section 1 of the Constitution. The State will supplement local tax revenues to the extent that a district is unable to raise the Tier 1 basic allotment by taxing at $.86 per $100 valuation. *Id.* § 16.252(a). If a district is able to raise the funds for the basic education program envisioned under Tier 1 through its own local tax effort, it receives no Tier 1 funds.[8]

Tier 2 similarly is premised on significant local tax effort. Under Senate Bill 7, the State will guarantee a yield of $20.55 per student for each penny of additional local tax effort over $.86. *Id.* § 16.302. In essence, the State funds Tier 2 only to the extent that a local district is unable to generate a yield of $20.55 per student for each penny of tax effort. Moreover, it is undisputed that $3,000 to $3,500 is needed to meet accreditation and other legal standards. Accordingly, most districts must tax at well over $.86 to generate Tier 2 funds simply to meet their Tier 1 needs.[9]

The system adopted under Senate Bill 7 thus has turned the school finance system envisioned under our Constitution on its head. Our Constitution has imposed a mandatory duty on the State to suitably provide for the system of public schools and only permits local property taxes to supplement state funding. TEX. CONST. art. VII, §§ 1, 3. Senate Bill 7 shifts that burden to local property taxpayers to provide for the public

---

8. For the 1993–94 school year, 294 districts, representing 1,652,643 students or 38% of all students in the State, will pay 50% or more of the costs of the Tier 1 basic education program. Over 100 school districts will pay virtually 100% of the cost of the basic education in their own districts and, in addition, put into the system $400 million to $600 million to pay for educating students in other districts throughout the State.

9. The Court confuses Tier 1 and Tier 2 and concludes that Senate Bill 7 is adequate because districts can combine their Tier 1 and Tier 2 funds to provide the basic program of education that meets accreditation and other legal standards. Tier 1 and Tier 2 have very distinct statutory purposes. The fact that the Court and State give no meaningful distinction to Tier 1 and Tier 2 simply illustrates the unsuitability of Senate Bill 7.

schools within their district through local tax dollars with state dollars supplementing only where the local districts cannot raise their Tier 1 and Tier 2 funds. By divesting the State of the obligation to make suitable provision, Senate Bill 7 bears no real relationship to the object of article VII, section 1. The State may not discharge its constitutionally mandated duty to suitably provide for the State's public schools by passing off its obligation to local districts and local property taxpayers.

Although it is significant that under Senate Bill 7 state funding accounts for only 43% of total education dollars, the exact percentage split between state and local funding is not determinative of constitutional suitability under article VII, section 1. The Court has stated before, and correctly so, that the Constitution contains no requirement that public education be funded solely by state revenue and that local property tax revenues may play a role in financing an efficient system of public schools. *Edgewood III*, 826 S.W.2d at 503; *Edgewood II*, 804 S.W.2d at 500; *Edgewood I*, 777 S.W.2d at 398. Accordingly, our Constitution permits joint state and local funding. Just as it is improper to measure suitability by looking solely at total state dollars spent, it would also be improper to evaluate suitability based solely on the percentage split between state and local funding. What is at issue is the substantive structure of the financing scheme adopted under Senate Bill 7. And that scheme abdicates the State's constitutional duty to provide for a basic educational program and impermissibly shifts the burden to local taxpayers.

The State's over-reliance on local property taxes under Senate Bill 7 is made more blatantly obvious through the capture [10] provisions of Chapter 36. TEX.EDUC.CODE §§ 36.001–004. Through these provisions, the State forces up local property tax rates so that the State may capture the local districts' "excess" taxable wealth and revenues and distribute the funds brought into the system as state dollars.[11] Senate Bill 7 operates to bring into the system $400 million to $600 million [12] each year in local property tax revenues to be distributed throughout the State to achieve fiscal neutrality under the efficiency clause of article VII, section 1. In other words, the mechanism adopted by the State to discharge its constitutional obligation to establish an *efficient* system of education is one that is wholly dependent upon local property tax wealth and tax revenues. The State's manipulation of local property tax wealth and tax revenues under the guise of state funding should not be countenanced by the Court.

Because the State has abdicated its constitutional duty to establish and to suitably provide for an efficient system of public schools to the local districts, I would hold

---

10. The Court, the trial court below, and the State all refer to the provisions of Chapter 36 as "recapture." This is incorrect. Recapture presupposes that whatever is captured once belonged to or was owned by the person or entity that has *re* captured the item. The use of the term "recapture" continues the false pretense that the $400 million to $600 million in local property tax revenues brought into the system from the wealthiest districts constitute state funds. A more honest designation for these funds is "captured" local tax revenues.

The Court additionally falls into a far more dangerous trap. The Court approves the capture provisions of Senate Bill 7 by concluding that the $280,000 cap permits the State to utilize the "excess resources in the wealthiest districts." 917 S.W.2d at 735–37. Excess of what? The property within a district has whatever value it has by virtue of market forces. The notion that the State may determine that an individual or entity has some level of wealth that is "excess" and that must be distributed to others is certainly new to Texas law and is contrary to the fundamental principles of private property upon which this Country was founded.

11. In 1983–84, at the beginning of the *Edgewood* saga, the average local tax rate in the State was **$.61**. TEXAS RESEARCH LEAGUE, BENCH MARKS 1993–94 SCHOOL DISTRICT BUDGETS 22 (1994). By 1988–89, local districts throughout the State averaged a tax rate of **$.88** per hundred valuation. *Id.* By 1992–93, the average local tax rate jumped to **$1.38** per hundred valuation, an increase of 57% over the 1988–89 rate. *Id.* To achieve fiscal neutrality, Senate Bill 7 requires all districts to be taxing at $1.50 by 1996–97.

12. This money is captured from 104 of the State's 1042 school districts representing only 6% of the total students. These districts pay not only 100% of the costs of educating students in their districts, but bear the full responsibility of equalizing funding to the remaining 938 school districts.

that Senate Bill 7 violates article VII, section 1 of the Texas Constitution.[13]

### III. State Ad Valorem Tax

The State's reliance on local property taxes in Senate Bill 7 leads to a second insurmountable constitutional obstacle: article VIII, section 1-e. The reliance on local property taxes is so great that Senate Bill 7 amounts to nothing more than a transparent attempt to circumvent the prohibition against a state ad valorem tax. *See* TEX. CONST. art. VIII, § 1-e. Senate Bill 7 creates a state ad valorem tax and the Court errs in concluding otherwise.

Under Senate Bill 7 the State so completely controls the levy, assessment, and disbursement of tax revenue as to leave local districts virtually no meaningful discretion in deciding whether to tax or at what rate to tax. *Edgewood III*, 826 S.W.2d at 502. The State mandates that all districts levy a tax of at least $.86 per hundred valuation to participate at all in the Foundation School Program and must tax at that rate to attempt to raise their own Tier 1 basic allotment funds. TEX. EDUC.CODE § 16.252. The State sets the maximum tax rate at $1.50. *Id.* § 20.04(d). And as conceded by the State, the entire financing system devised under Senate Bill 7 to achieve a constitutionally efficient educational system is to force all districts to tax at the maximum rate of $1.50. Further, in reaching the ultimate and maximum tax rate of $1.50, local district discretion is severely restricted by *mandatory* roll back provisions requiring roll back elections for any tax increase of more than $.06. TEX.TAX CODE § 26.08. There can be no question that the tax is mandatory and that local districts have no meaningful discretion in deciding whether to levy the tax or at what rate to tax.

Not only does the State control the levy and assessment of taxes but it also controls the disbursement of the tax revenues. The Court addresses this aspect of Senate Bill 7 with the unsupported conclusion that Senate Bill 7 does not "prescribe the distribution of proceeds." 893 S.W.2d at 471. This is incorrect. Local tax revenues must be allocated first to cover the district's local fund assignment. TEX.EDUC.CODE §§ 16.251(a), (b); .252(d); .254(a), (c). Any "excess" wealth, either in the form of taxable wealth or actual tax revenues generated from local tax effort, is distributed throughout the State under the capture provisions of Chapter 36. *Id.* §§ 36.001–.004. The fact that districts have various options to achieve the equalized wealth level does not make the tax any less of a mandatory state property tax. Rather, the options for reducing "excess" wealth simply illustrate the extent of the State's control and the rather elaborate scheme the State has contrived for capturing and distributing local tax revenue.

The Court stretches to avoid the conclusion that Senate Bill 7 imposes a state ad valorem tax by erroneously concluding that local districts have some discretion to tax at a rate less than $1.50. There is certainly no dispute among the parties that Senate Bill 7 contemplates full implementation with all districts taxing at $1.50 as soon as possible. This certainty is simply the result of the economic incentives built into Senate Bill 7. Property poor districts will tax at $1.50 to obtain the full benefit of the guaranteed yield.[14] Since every penny of tax effort up to $1.50 by these districts generates $20.55 from the State, they will tax at $1.50 as soon as they can. Likewise, wealthy districts, losing a portion of their tax base due to the $280,000 cap, will be forced to raise their tax rate to $1.50 simply to maintain the revenue

---

**13.** I join JUSTICE HECHT's view, 917 S.W.2d at 764, "that §§ 36.003(3) and (4) of the Education Code and the code sections which implement them, §§ 36.091–.096, and 36.121–.123, violate article VII, section 3 of the Texas Constitution." I simply do not reach this issue because Senate Bill 7, at the threshold, does not pass constitutional muster. Additionally, I could not join JUSTICE HECHT's suggested injunction, at 764, as it would be too narrow a remedy to address my more significant concerns.

**14.** As the Court notes, Senate Bill 7 raised the guaranteed yield maximum tax rate from $1.27 under Senate Bill 351 to $1.50, but reduced the amount guaranteed from $22.50 to $20.50. Because of the reduction in the amount guaranteed per penny of tax effort, districts naturally will be forced to tax at the $1.50 rate to maintain their guaranteed yield funding.

necessary to support their existing educational programming. There can be no real question that Senate Bill 7 requires all districts to tax at $1.50.

The State does not even attempt to defend Senate Bill 7 on the grounds that districts have discretion to tax at some rate less than $1.50. Rather, *all* of the State's evidence at trial conceded and assumed that Senate Bill 7 would force all districts to tax at $1.50 at full implementation. While Senate Bill 7 may not set out expressly that all districts must tax at $1.50, the system enacted under Senate Bill 7 nevertheless requires all districts to tax at that level. In failing to recognize the economic realities to which the parties have acceded, the Court engages in a fiction that elevates form over substance.

The fact that article 2784g permits some districts to tax at rates up to $2.00 does not save Senate Bill 7 under article VIII, section 1–e. The Court must and does concede this point. The Court concludes that the $1.50 cap under section 20.09 of the Education Code is so significant, regardless of article 2784g, that if districts are forced to tax at $1.50 to achieve accreditation and other legal standards, the floor for the tax rate becomes a ceiling and divests local districts of discretion in setting their rate. 893 S.W.2d at 471. In this circumstance, the Court admits that "the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable." *Id.*

Moreover, simply because some districts have some discretion in setting their rates, even rates as high as $2.00, does not change the inevitable conclusion that Senate Bill 7 enacts a state property tax. Senate Bill 7 is wholly dependent upon local districts raising and contributing their local property taxes to fund in the first instance the State's obligation to make suitable provision for primary education. In capping districts' wealth at $280,000, Senate Bill 7 distributes local property taxes and local property tax wealth throughout the State to fund the State's constitutional obligation to make this educational system efficient. The forced levy, at whatever tax rate, and distribution of local taxes or property tax wealth outside the district in satisfaction of the State's constitutional obligation to provide for public schools amounts to an unconstitutional state ad valorem tax.[15]

Although scarcely mentioned by the Court, the State's primary argument that the tax is not a state ad valorem tax is that participation in the Foundation School Program is not mandatory, and therefore, a local district need not levy any tax if it does not want to receive state funds for education. Perhaps the Court ignores this argument because it has so little merit.

The State cannot legitimately argue that Edgewood I.S.D. has any choice in deciding whether to participate in the Foundation School Program. Edgewood, with a taxable wealth per student of only $25,873, can generate only $2.59 per penny of local tax effort. Taxing at $.86, Edgewood can generate only $222.74 per student; taxing at the maximum $1.50, they can generate only $388.50 per student. When $3,000 to $3,500 is needed per student to meet the Tier 1 accreditation and other legal standards, it is clear that Edgewood must participate in the Foundation School Program and must levy the requisite taxes to provide the basic education to its students.[16]

Moreover, the State clearly views the local tax as mandatory as it concedes that fiscal neutrality is achieved only at all districts taxing at $1.50. If, as the State suggests, participation in the Foundation School Program were voluntary, those 104 school districts funding the equalization component of Senate Bill 7 could simply opt out of the

---

15. The Court misconstrues the ban on state ad valorem taxes in article VIII, section 1–e as prohibiting only a "statewide" ad valorem tax where the State imposes on districts some uniform tax at a uniform tax rate. This is incorrect. There may be variations in the rate. What is determinative is that the State mandates the local tax and uses the revenues thus generated for state purposes.

16. In fact, a district would have to have a wealth level per student of $260,740 to be able to raise the $2,300 basic allotment by levying the Tier 1 tax of $.86. Only 120 of the State's 1042 districts have that wealth level or higher. Moreover, a district would need a wealth level of $348,837 to raise $3,000 at a Tier 1 tax rate. Only 75 districts have that wealth level or higher.

Foundation School Program and take their $400 to $600 million in local tax revenues with them. Senate Bill 7 fails its essential purpose if the local tax is not mandatory.

Senate Bill 7 varies little from its predecessor Senate Bill 351. Senate Bill 7 has simply exchanged County Education Districts for local school districts, but with local tax revenues redistributed state-wide instead of county-wide. Senate Bill 7 mandates that districts levy a tax at a given rate, limits the local districts' discretion to increase that rate to $.06 per year, caps the maximum rate at $1.50, envisions full implementation only when all districts are taxing at $1.50, and prescribes the distribution of the proceeds through the local fund assignment and capture provisions. Under Senate Bill 7, the State's control over the levy, assessment, and distribution of local taxes is so great as to divest local districts of any meaningful discretion. Like its predecessor, Senate Bill 7 adopts a state ad valorem tax and violates article VIII, section 1–e.

## IV. Conclusion

Although Senate Bill 7 actually closes the educational funding gap [17] throughout the State, it does so at the expense of other constitutional provisions. We cannot shrink from our constitutional obligations and when, as here, there are several constitutional provisions at issue, we should be loathe to tolerate a violation of one provision in preference of another, no matter how lofty the goals of the legislation. The Legislature must establish and make suitable provision for the maintenance and support of an efficient system of public free schools and must do so without enacting a constitutionally prohibited state ad valorem tax. As long as the Legislature continues its inordinate reliance on local property taxes as the primary funding

mechanism, the constitutional tensions will remain unresolved. Reliance on local property tax revenues challenges the efficiency of the system because of local wealth disparities. Ameliorating local wealth disparities through a system of mandatory local taxes and capture affronts the prohibition against state ad valorem taxes. The systemic change called for in *Edgewood I,* 777 S.W.2d at 397, remains elusive.

Why the Court today chooses to reject its prior calls for systemic change and accepts as constitutional what we said was unconstitutional only three years ago is unclear. The Court's action appears to be nothing more than an expression of frustration at its inability to extricate itself from this litigation. While I too find it unfortunate that after over ten years of litigation in Texas Courts we are no closer to a constitutional system of public education that provides for a general diffusion of knowledge, I am unwilling to sacrifice other of this State's citizens' constitutional rights to achieve efficiency in our schools.

\* \* \* \* \* \*

Senate Bill 7 violates both article VII, section 1 and article VIII, section 1–e of the Texas Constitution. I would hold Senate Bill 7 unconstitutional in its entirety and would reverse the judgment of the trial court holding otherwise.

HECHT, Justice, joined by OWEN, Justice, concurring and dissenting.

I join in all but Part IV of the Court's opinion, and in the Court's judgment denying relief to Edgewood Independent School District, et al., and Alvarado Independent School District, et al.

I agree with the Court that the public school finance system structured by the cur-

---

17. While I agree generally with the Court's approach to efficiency, I think it important to note that the standard of efficiency first enunciated in *Edgewood I* is based upon a false premise. In defining efficiency solely as equal access to similar revenues for similar levels of tax effort, *Edgewood I,* 777 S.W.2d at 397, the Court presumed that the property in high wealth districts was insulated from taxation and support for education because that property was taxed at relatively low rates. *Id. See also Edgewood II,* 804

S.W.2d at 497. This presumption ignores the reality that, at least for residential properties, property values reflect the quality of education available in the district and that taxpayers often pay for education in the purchase price of their homes. That is to say, these property owners, in raw dollars, actually pay the same for their educational programs as is paid by other property owners in other districts although the tax rate required to generate those dollars may be less.

rent law, Senate Bill 7,[1] as implemented at the time of the district court's judgment now on appeal, and taken as a whole, does not violate article VII, section 1 of the Texas Constitution. The Court makes clear, as I believe *Edgewood I* and *II*[2] also did, that article VII, section 1 requires the Legislature to provide a basic education through a public school system, the benefits and burdens of which are fairly uniformly distributed throughout the state, but does not require the Legislature, as long as it has fully discharged this duty, to guarantee that whatever more may be spent on education by people in one area will be equally available to all.

I also agree with the Court that the evidence does not show that statutory provisions for funding school facilities cause the system as a whole to violate article VII, section 1. I doubt whether the constitutional standard of efficiency could be applied to one aspect of the public school finance system independently of all other aspects, but even if it could, the Constitution does not authorize it. Article VII, section 1 requires an "efficient system". Disparities in funding facilities become constitutionally significant only when they affect the efficiency of the system as a whole. The question is not whether the method of funding facilities is inefficient, but whether that method makes the entire system inefficient. The answer, on this record, is no.

I disagree with the Court in two principal respects. First, I believe that the provisions of Senate Bill 7 which permit—in reality coerce—some school districts to pay the cost of education in other districts in lieu of forced consolidation of districts or property detachment violate article VII, section 3 of the Texas Constitution as construed in *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20 (1931). This violation is not in my view fatal to the entire finance system; operation of the offending provisions could be enjoined without disturbing the remainder of Senate Bill 7,

and I would do so even though the resulting system would be far different from the one now in place. Second, I believe the school finance laws still levy a state ad valorem tax in violation of article VIII, section 1–e, as the Court held they did in *Edgewood III*.[3] This flaw is fatal to the system and would justify the same injunctive relief this Court granted in *Edgewood III*. Therefore, I need not reach the other arguments made by the petitioners referred to by the Court as "the property-rich districts".

For these reasons, which I now explain more fully, I respectfully dissent.

## I

If one set about to devise the ideal system for financing public schools in a major state at the end of the twentieth century, it is highly unlikely that Senate Bill 7 would be the result. Texas' public school finance system is not the product of careful study and planning, but of historical anomalies and political pressures over the course of more than a century.

In *Edgewood I* this Court held that the system violated article VII, section 1 of the Texas Constitution, which states: "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." The Court concluded that the system did not meet the constitutional standard of efficiency because of gross disparities in tax burdens and funding throughout the state. The situation, briefly described, was this. The State did not have sufficient tax revenues to provide every student a basic education—in the Constitution's words, "a general diffusion of knowledge"—without impairing its other responsibilities. To provide the necessary revenues, the State had for many years chosen to rely increasingly on local school district ad

1. Act of May 28, 1993, 73rd Leg., R.S., ch. 347, 1993 Tex.Gen.Laws 1479.

2. *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989) [*Edgewood I*]; *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex. 1991) [*Edgewood II*].

3. *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 500–503 (Tex.1992) [*Edgewood III*].

valorem taxes. Among the state's more than 1,000 school districts, however, the student population and total value of taxable property per district varied enormously, so that in some districts a relatively low tax rate easily generated ample revenues to educate resident students, while in other districts even a relatively high tax rate failed to generate enough. The disparities were so great that the State could not eliminate them simply by directing its funds to districts with inadequate local revenues. The vast differences in tax rates and revenues from district to district, employed to provide a basic education, resulted in a motley system that was much more burdensome to taxpayers in some areas than others, adequate or inadequate here and there irrespective of the local tax burden, and thus on the whole inefficient.

Because these constitutional problems inhered in the very structure of the public school finance system and could not be corrected simply by reallocating available state funds, *Edgewood I* concluded, "the system itself must be changed." 777 S.W.2d at 397. Although we left the method of rectifying the system to the Legislature, its options were relatively clear. One was to adopt an entirely new way of financing public schools, such as with vouchers. Although this proposal has been advocated by a number of legislators and others, and by parties to this case, it does not appear to have received serious consideration in the Legislature. Another option was to consolidate school district tax bases without consolidating the districts entirely, leaving their respective governments independent but providing a broader and more uniform source of ad valorem tax revenue. After *Edgewood II*, the Legislature attempted this by creating county education districts ("CEDs"), which we reviewed in *Edgewood III*. However, because the Legislature gave CEDs no meaningful discretion in exercising their taxing power, we held that the tax authorized was in effect a state ad valorem tax prohibited by article VIII, section 1-e of the Texas Constitution. 826 S.W.2d at 500–503. The Legislature did not attempt to repair these defects and abandoned this approach. A third option was for the Legislature to consolidate school districts to eliminate disparities in total taxable prop-

erty and student population, and condition payment of state funds on a minimal level of local taxation, so that supplementation of ad valorem taxes with state funds would not be required for efficiency. The Legislature has been unwilling even to explore this course because of the political opposition to it.

The Legislature also had options which did not involve structural changes to the public school finance system. One was to propose an amendment to the Constitution to remove any impediment to the finance system it chose. It attempted this following *Edgewood III, see* Tex.S.J.Res. 7, 73rd Leg., R.S., 1993 Tex.Gen.Laws 5560, but the voters rejected the proposed amendment by a large margin. Another alternative was to lower the cost of a basic education by reducing bureaucratic and administrative expense so that existing state revenues would be sufficient for the necessary supplementation of local ad valorem taxes. No significant effort has been made to do this. Finally, the Legislature could find new sources of state revenue to supplement local ad valorem taxes in order to level disparities among school districts. One such source, a personal income tax, has been rejected by the Legislature and cannot now be adopted without approval of the voters in a statewide referendum. TEX.CONST. art. VIII, § 24. The Legislature does not appear to have given serious consideration to increasing other tax revenues for education.

Today, despite the Court's admonition that systemic change is essential, made in *Edgewood I*, 777 S.W.2d at 397, and repeated in *Edgewood II*, 804 S.W.2d at 496, and the Legislature's three opportunities in as many years to comply with constitutional requirements, the basic system with its fundamental flaws remains intact. There are about as many school districts as there were before *Edgewood I*, the disparities among them in taxable property per student are just as great, and the State has increased its reliance on local ad valorem taxes. It is a telling point that while the finance system had its defenders in each of the forms we reviewed in *Edgewood I, Edgewood II* and *Edgewood III*, the only defender of Senate Bill 7 is the State.

Senate Bill 7 is among the most complex laws in Texas. Central to its operation is the following scheme. When fully implemented, the law prohibits a school district from having more than $280,000 in "taxable property" per "student", Tex.Educ.Code §§ 36.002(a), the latter terms being specially defined, *id.* §§ 11.86, 36.001. A district which has more than this may choose one of five options: (1) voluntary consolidation with another school district; (2) voluntary detachment of property from the district to be annexed to another district for tax purposes; (3) purchase of average daily attendance credits, the effect of which is simply to pay the State the difference between the district's total tax revenue and the revenue that would have been generated had the tax base not exceeded $280,000 per student; (4) contracting to pay for the education of students not residing in the district, the effect of which is simply to pay the same difference in revenues to another district or districts; or (5) voluntary consolidation of the district's tax base with that of another district. *Id.* § 36.003. The last three options require voter approval each year. *Id.* §§ 36.096, 36.122, 36.152–.154. If a district does not exercise one of these options, the Commissioner of Education is required to detach certain property from the district until it has less than $280,000 per student, or if that cannot be done, to consolidate the district with one or more other districts until the same result is achieved. *Id.* § 36.004.

If involuntary detachment were used in every case, many districts would lose over half their property tax base. Voters would pay taxes in districts hundreds of miles from their residences. Involuntary consolidation could also result in schools far apart being included in noncontiguous districts. These possible consequences of Senate Bill 7, which no one disputes, can all be avoided, however, if the taxpayers in the nearly 100 districts with more than $280,000 property per student simply help pay to educate students in other districts. At the time of trial, not surprisingly, every "rich" district but one had "chosen" this course.

The "rich" districts argue that Senate Bill 7 violates eleven separate provisions of the Texas Constitution. While several of these challenges raise troublesome issues, I focus on the two clearest ones.

**II**

Two of the options Senate Bill 7 affords school districts to avoid forced consolidation or property detachment, §§ 36.003(3) & (4), permit school districts to spend local taxes to educate students outside their boundaries. While the Legislature has plenary power over the creation of school districts, it cannot authorize them to take action not allowed by the Constitution. Article VII, section 3 states in part:

> the Legislature may also provide for the formation of school district [sic] by general laws ... and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools *of such districts,* ... and the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings *therein....*

(Emphasis added.) The express language of this provision restricts the use of a district's tax revenues to schools in the district.

Thus, construing this provision in *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931), this Court held:

> it is plain, we think, that the property and funds of the public schools are held in trust by the city, district, county, or other statutory agency, to be used for the benefit of the school children of the community or district in which the properties exist, or to which the school funds have been allocated. We think these properties and funds are so plainly and clearly impressed with a trust in favor of the local public schools of the city or district that they are within the protective claims of both the state and federal Constitutions, and that the Legislature is without power to devote them to

any other purpose or to the use of any other beneficiary or beneficiaries.

*Id.* 40 S.W.2d at 26.

The State argued in *Love* that the Legislature's power to create, abolish, and change the boundaries of school districts authorized it to impose obligations on districts to educate nonresident students. This is the very same argument the State makes now, and we clearly rejected it in *Love.* We said:

> Since the Constitution, art. 7, § 3, contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts, it is obvious that the education of nonresident scholastics is not within their ordinary functions as quasi-municipal corporations; and under the authorities cited the Legislature is without power to impose such an obligation on them, without just compensation. Aside from this rule, the necessary implication from the constitutional provision is that the Legislature cannot compel one district to construct buildings and levy taxes for the education of nonresident pupils. The Legislature, by section 3, art. 7, is only authorized to permit school districts to impose taxes for these purposes for schools within the district, and to say that the Legislature can compel a district to admit nonresidents without just compensation would be permitting that department to do indirectly what it admittedly cannot do directly.

> \* \* \* \* \* \*

> Since the Constitution does not permit the taxation of the people of a school district for the support of that district, except upon a vote of the people of the district, it is not debatable that the Legislature cannot compel one district to use its funds and properties for the education of scholastics from another district, without just compensation.... [W]here a school district has facilities and teachers in excess of those necessary for its own scholastics, the state has the power to require it to accept transfers from another district, but only upon the payment of reasonable compensation therefor.... The Legislature, however, is without power to compel any district to provide additional facilities, teachers, etc.,

for the education of scholastics from another district.

*Id.* 40 S.W.2d at 27, 29–30 (citations omitted).

In *Edgewood II* the State made the same argument and urged the Court to overturn *Love.* We refused, explaining:

> On motion for rehearing, plaintiff-intervenors request that we modify our opinion to overrule *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931), or interpret that case "in a manner that would permit the [state-wide] recapture of local ad valorem revenues for purposes of equalization." We believe *Love* is sound and decline to overrule or modify it. Moreover, the interpretation requested by plaintiff-intervenors would violate the Texas Constitution....

> In *Love,* this Court held that the City of Dallas could not be compelled to educate students who resided outside of the city's school district. We held that article VII, section 3 of our Constitution only "contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts." 120 Tex. at 367, 40 S.W.2d at 27. Focusing on the Legislature's power to create school districts and define their taxing authority, we noted in this opinion that, consistent with *Love* and contrary to the district court's suggestion, tax base consolidation could be achieved through the creation of new school districts. We said these school districts could be organized along county or other lines and could be given the authority to generate local property tax revenue for all of the other school districts within their boundaries.

> Plaintiff-intervenors now urge us to go further. They argue that all school districts are mere creatures of the state, and "in reality, all taxes raised at the local level are indeed State taxes subject to state-wide recapture for purposes of equalization." Their position raises the question of whether the Legislature may constitutionally authorize school districts to generate and spend local taxes to enrich or supplement an efficient system. Because the Constitution does permit such enrichment,

without equalization, local taxes cannot be considered "State taxes subject to state-wide recapture."

Our Constitution clearly recognizes the distinction between state and local taxes, and the latter are not mere creatures of the former. The provision that "[n]o State ad valorem taxes shall be levied upon any property in this State," TEX. CONST. art. VIII, § 1–e, prohibits the Legislature from merely recharacterizing a local property tax as a "state tax." Article VII, section 3, however, states that "the Legislature may authorize an *additional* ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the *further* maintenance of public free schools, and for the erection and equipment of school buildings *therein.*" TEX. CONST. art. VII, § 3 (emphasis added). These constitutional provisions mandate that local tax revenue is not subject to state-wide recapture.

804 S.W.2d at 499 (footnote omitted).

To avoid the limitation of article VII, section 3, as we construed it in *Love* and *Edgewood II*, the State makes two arguments. First, it contends that *Love* prohibits the State only from compelling school districts to educate nonresident students, not from permitting them to choose to do so. While it is true that *Love* refers repeatedly to legislative coercion, which was the complaint made in that case, its reasoning is not so cramped. Article VII, section 3, which is the basis of *Love*'s holding, is a limit, not on the Legislature's treatment of school districts, but on the authority of the districts the Legislature can create. The Legislature cannot coerce school districts to spend their resources outside their boundaries, not because the Legislature cannot treat school districts that way, but because the districts are not authorized to spend their resources that way. In *Love*'s words, the resources of a school district are held "in trust . . . for the benefit of the school children in the community or district". 40 S.W.2d at 26.

The State's argument that Senate Bill 7 does not coerce districts to choose options (3) and (4) in section 36.003, but simply allows them those alternatives, can hardly be taken seriously. The Legislature is fully aware that school districts will avoid consolidation and permanent property detachment at virtually all costs. According to the record before us, only one district has yet chosen any option other than (3) or (4). Senate Bill 7 is coercive in reality, but even if it were not, it could not permit school districts to choose to do what the Constitution does not authorize them to do.

The fact that the voters of a district must approve option (3) or (4) is inconsequential. Senate Bill 7 is no less coercive to the voters of a district than to its governing board, and the voters have no more authority under article VII, section 3 than a district's board has.

The second argument the State makes is that article VII, section 3, as construed by *Love*, does not prohibit school districts from spending funds outside their boundaries so long as they receive just compensation, and that even if Senate Bill 7 is coercive, the school districts which pay over funds to be used elsewhere receive just compensation by avoiding involuntary consolidation or property detachment. While the State's reading of the Constitution is correct, its application is fairly cynical. What Senate Bill 7 says to school districts, in essence, is "share your revenues, or else". Not suffering the "else", the State argues, is just compensation for the sharing. To call this sort of extortion "compensation" is strained; to call it "just" is wrong.

The reasons why are obvious. Suppose, for example, the Legislature required school districts to choose between forced consolidation and payment of a portion of their revenues to finance the juvenile justice system, or state highway construction, or general state expenses. The first alternative arguably bears an indirect, albeit tenuous, relation to education; the other two bear no relation at all. The Court's opinion would allow all three. Neither the purpose nor the language of article VII, section 3 can withstand the strain of a construction which empowers the Legislature to offer school districts a "choice" between helping to finance state highways and forced consolidation in order to "recapture"—*i.e.*, appropriate—local

ad valorem taxes for state use. Moreover, this improper reading of one provision affects others. Under article IX, section 1 of the Constitution, the Legislature can create counties, and it would follow from the Court's holding in this case that the Legislature could afford a county the options of paving roads in a neighboring county or having its boundaries changed under article IX, section 2. The same proposition could be applied to municipal and other corporations which the Legislature has the power to create. It is no answer that the Legislature may appear unlikely to use this power; Senate Bill 7 once seemed unlikely. No principle prevents the expedient which the Court employs to uphold Senate Bill 7 from being used in many other contexts.

The State recognized in *Edgewood II* that *Love* prohibits a redistribution of local tax revenues among school districts. That is why the State urged the Court to modify or overrule *Love*. Reiterating the same argument now a third time, the State has finally achieved what *Love* and *Edgewood II* denied it in the plainest terms. The Court's conclusion that article VII, section 3 gives a school district no right to insist that its tax revenues be spent to benefit its schools simply contradicts *Love*'s language that local tax revenues are impressed with a "trust in favor of the local public schools . . . within the protective claims of both the state and federal Constitutions". 40 S.W.2d at 26. Limiting its discussion to districts' *rights*, the Court simply ignores the limits on the *authority* of the Legislature and school districts under article VII, section 3. *Love* specifically holds that "the Legislature is without power" to obligate school districts to educate nonresidents without just compensation. *Id.* 40 S.W.2d at 27. In sum, school districts have both a right and a duty to devote local tax revenues to local schools, absent just compensation. Legislative threats are not, in my view, "just compensation".

The Court suggests that a modified view of *Love* is necessary if the Legislature is to fulfill its responsibility to provide for an efficient school finance system. This was, of course, the same argument the State made in *Edgewood II,* which the Court rejected. The

argument has no merit since, as I have noted above, the State has a number of options open to it which do not violate article VII, section 3. The State's difficulty in complying with sections 1 and 3 of article VII is due, not to a conundrum created by those provisions, but to the Legislature's intransigence in making systemic changes.

I would hold that sections 36.003(3) and (4) of the Education Code and the sections which implement them, §§ 36.091–.096 and 36.121–.123, violate article VII, section 3 of the Constitution, and that their operation should be enjoined. While this would change the operation of Senate Bill 7 dramatically—so far every school district but one has chosen option (3) or (4) to avoid consolidation or detachment of property—the basic structure could continue to operate.

### III

The $280,000 cap and the five options for meeting it have a single, transparent purpose: to force statewide redistribution of local ad valorem taxes. Having chosen not to alter district boundaries and to continue to rely upon local tax revenues for well over half the cost of public education, the State must find a way of spreading those revenues around in order to achieve the efficiency required by article VII, section 1 of the Constitution. The result, purely and simply, is a state ad valorem tax forbidden by article VIII, section 1-e. The State itself characterizes the effect of Senate Bill 7 on local tax revenues as "recapture", which, as JUSTICE ENOCH observes, *post* at 751–52, suggests that the State considers local revenues to be state revenues that have been lost.

In *Edgewood III,* we stated the test for determining whether an ad valorem tax is a state tax:

An ad valorem tax is a state tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion. How far the State can go toward encouraging a local taxing authority to levy an ad valorem tax before the tax becomes a state tax is difficult to delineate.

Clearly, if the State merely authorized a tax but left the decision whether to levy it entirely up to local authorities, to be approved by the voters if necessary, then the tax would not be a state tax. The local authority could freely choose whether to levy the tax or not. To the other extreme, if the State mandates the levy of a tax at a set rate and prescribes the distribution of the proceeds, the tax is a state tax, irrespective of whether the State acts in its own behalf or through an intermediary. Between these two extremes lies a spectrum of other possibilities. If the State required local authorities to levy an ad valorem tax but allowed them discretion on setting the rate and disbursing the proceeds, the State's conduct might not violate article VIII, section 1–e. It is difficult, perhaps impossible, to define for every conceivable hypothetical precisely where along this continuum such taxes become state taxes.... Each case must necessarily turn on its own particulars.

826 S.W.2d at 502–503. Senate Bill 7 fails this test.

First, Senate Bill 7 controls local tax rates. While section 20.09(a) sets only a maximum rate of $1.50 per $100 valuation (subject to very narrow exceptions in sections 20.09(c)–(d) and in article 2784g and certain related special statutes in the Texas Education Code Auxiliary Laws, *ante* at 732, n. 15), school districts have no meaningful discretion as a practical matter to tax at any other rate. They will move immediately to the maximum rate, either out of desire to maximize the funds they receive from the State, or out of necessity to obtain funds essential to their present level of operation. The delay of a few years that some districts will have in reaching the maximum rate, due to limits on annual increases and the possibility of rollback elections, does not detract from the fact that Senate Bill 7 contemplates a uniform tax rate and allows no other result.

Both the district court and all parties acknowledge that every school district in Texas will move as quickly as possible to the maximum $1.50 rate because of the provisions of

Senate Bill 7. The Court's view of this is that while the statute "may *encourage* districts to tax at the maximum allowable rate, the State in no way requires them to do so." *Ante* at 738. This view, and the Court's characterization of a district's decision in these circumstances as "an exercise of discretion", *ante* at 738, blinks reality. The local ad valorem tax rate in every school district would hardly be more certain if the Legislature simply prescribed it, as did Senate Bill 351,[4] which we reviewed in *Edgewood III.* This is a factual matter about which there is absolutely no disagreement in this case.

Second, Senate Bill 7 controls the distribution of local tax revenues in excess of those allowed under the $280,000 cap. Payments to the State are reallocated to other districts according to specified formulae in order to help equalize school funds. The remitting district has no voice in this reallocation. The State's control of redistributing local revenues is no different than it was under Senate Bill 351.

Under the test of *Edgewood III,* Senate Bill 7 levies a state ad valorem tax. A simpler test yields the same result: it operates no differently and has no other effect than a state ad valorem tax. Even the Court acknowledges that when the cost of a basic education approaches the revenue available at the maximum $1.50 rate, as the evidence indicates it will within a very few years at most, "the conclusion that the Legislature had set a statewide ad valorem tax would appear to be unavoidable". *Ante* at 738. I agree with the Court that this conclusion is both imminent and inexorable. I disagree that the constitutional defect in Senate Bill 7 should be tolerated while we await the inevitable.

In *Edgewood III,* we observed: "The history of article VIII, section 1–e thus establishes that its framers and ratifiers specifically intended to eliminate the state ad valorem tax as a source of funds for public education." 826 S.W.2d at 502. In my view, Senate Bill 7

4. Act of April 11, 1991, 72nd Leg.R.S., ch. 20, 1991 Tex.Gen.Laws 381, *amended by* Act of May 27, 1991, 72nd Leg., R.S., ch. 391, 1991 Tex.Gen. Laws 1475.

transgresses the language and intent of the Constitution.

\* \* \* \* \* \*

For these reasons, I would hold that the public school finance system violates article VII, section 3 and article VIII, section 1-e of the Texas Constitution. Accordingly, I respectfully dissent.

SPECTOR, Justice, dissenting.

This case is about a court that has come full circle. Just six years ago, faced with gross disparities in the school financing system, we unanimously decided that every school district must have similar revenues for similar tax effort. Today's cobbled-together opinion rejects that mandate, and instead sanctions *dissimilar* revenues for similar tax effort. This holding is not based on any matters that were tried in the district court. Instead, it is based on the previously-rejected premise that the state's constitutional responsibility is satisfied by providing most schoolchildren with the very least, and the favored few with the best money can buy. Because I believe this doctrine has no place in the field of public education, nor in the jurisprudence of this state, I dissent.

## I.

Until today, there was a clear, simple test for determining whether the public school finance system was "efficient," as required by article VII, section 1 of the Texas Constitution:

> There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort.

*Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 397 (Tex.1989) ("*Edgewood I*"). Applying this test in *Edgewood I,* we held that the school finance system was inefficient because it failed to provide rich and poor districts with substantially-similar access to revenues. *Id.*

We also noted in *Edgewood I* that the finance system was inefficient in the sense that it failed to provide a "general diffusion of knowledge statewide." *Id.* We made plain, however, that this failure was simply another result of the disparity in access to revenue:

> Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds. Certainly, this much is required if the state is to educate its populace efficiently and provide for a *general diffusion of knowledge statewide.*

*Id.* (emphasis added).

We applied the same standard two years later, holding that the school finance system remained inefficient because it still failed to provide a "direct and close correlation between a district's tax effort and the educational resources available to it." *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491, 496 (Tex.1991) ("*Edgewood II* ") (quoting *Edgewood I,* 777 S.W.2d at 397). There is no mention in *Edgewood II* of any requirement that the Legislature provide for a "general diffusion of knowledge"; our decision was based solely on the continuing disparity in access to revenue between rich districts and poor districts. *Id.*

The standard adopted in *Edgewood I,* and applied in *Edgewood II,* does not require equal spending in every district. Rather, the standard recognized the importance of local control: some districts might choose to tax and spend at higher levels than others. Thus, in both opinions, we noted that a local community could choose to supplement the financing of education. *Edgewood II* (on rehearing), 804 S.W.2d at 500; *Edgewood I,* 777 S.W.2d at 398. We emphasized, however, that all districts must have the opportunity to provide such supplementation on a similar basis. In *Edgewood I,* we explained that a district's ability to supplement must not depend on its property wealth; instead, "any local enrichment must derive solely from local *tax effort.*" 777 S.W.2d at 398 (emphasis added).[1] Similarly, in *Edgewood II,* 804

---

1. The majority, not surprisingly, completely omits this language from its opinion, even though it relies heavily on other language in the very same sentence. 917 S.W.2d at 729 (quot-

S.W.2d at 500, we emphasized that local supplementation is permissible only "so long as efficiency is maintained"—in other words, so long as rich and poor districts still have substantially-similar access to revenues. At no point have we ever indicated that the basic mandate of *Edgewood I*—similar yield for similar effort—only applies to a particular range of tax rates.

In accordance with our prior opinions, the trial of this case focused solely on the issue of whether Senate Bill 7 provides all districts with substantially-similar access to revenue at similar tax rates. The property-wealthy districts tried to shift the focus away from this standard; but the district court was steadfast, calling the issue "very simple":

> THE COURT: ... This is the equity test of Edgewood I, does the bill meet it or not meet it. We're not going to back up and retry all these issues that you lost on and that the Supreme Court has written on.
>
> So I am not going to let us back up. If you have anything on what we're here on today which is substantially the same revenue for substantially the same tax effort, then you need to ask that.
>
> All you did, Mr. Olson, was articulate the whole theory of the first trial which was that there is some basic foundation that everybody is entitled to and over that it's enrichment, and we don't have to worry about it—
>
> MR. OLSON: Your honor—
>
> THE COURT: —and we've already crossed that bridge.
>
> . . . .
>
> That is not what this trial is about. This trial is about substantially equal revenue for substantially equal tax effort. That's what we're trying to figure out.

The State shared the district court's view of "efficiency." The State's lead expert, who provided the bulk of the State's evidence, testified that he understood this Court's opinions to require very similar yields for equal tax effort across all wealth levels.

Neither the district court nor the parties could have foreseen that this Court would abruptly change the ground rules for determining "efficiency." An examination of the majority's opinion shows how dramatically those rules have changed.

## II.

The last time this case was before this Court, one justice authored an opinion criticizing the *Edgewood I* standard. *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 524 (Tex.1992) (*Edgewood III* ) (Cornyn, J., concurring and dissenting). The opinion urged this Court to decide "the substantive level of education our constitution requires"; and it repeatedly referred to this level as "a minimally adequate education." *Id.* at 526–27. The opinion was especially critical of our unanimous holding in *Edgewood I* that "[t]he amount of money spent on a student's education has a real and meaningful impact on the educational opportunity offered to that student." *Id.* at 529–31 (quoting *Edgewood I*, 777 S.W.2d at 393).

The position taken in this one-justice opinion, which advocated a standard very different from the one set out in *Edgewood I,* has now been adopted by a majority of this Court. According to the majority, the constitution requires the Legislature to provide a minimally-adequate education, which the majority describes as a "general diffusion of knowledge." The majority concludes that Senate Bill 7 meets this requirement:

> In Senate Bill 7, the Legislature equates the provision of a "general diffusion of knowledge" with the provision of an accredited education. By instituting the accountability regime set forth in Chapter 35, the Legislature has, we conclude, met its constitutional obligation to provide suitably for a general diffusion of knowledge.

917 S.W.2d at 730. The majority then recasts our *Edgewood I* standard as applying only to the provision of this minimally-adequate education:

> The State's duty to provide districts with substantially equal access to revenue ap-

ing, in part, the sentence in *Edgewood I* stating that our holding did not preclude communities

"from supplementing an efficient system established by the legislature; however . . . .").

plies *only* to the provision of funding necessary for a general diffusion of knowledge.

917 S.W.2d at 731 (emphasis in original).[2] Because the present finance system enables every district to meet accreditation requirements, the majority necessarily concludes that Senate Bill 7 is efficient.

All of this will come as a surprise to the litigants. The "general diffusion of knowledge" requirement has never been a part of this case. Because the district court was applying the original *Edgewood I* standard, it severed out what it called "adequacy issues," including the issue of "whether the legislature appropriates sufficient funds for districts to provide a constitutionally, minimally acceptable education." Thus, there is virtually no evidence on this issue in the record.

The little evidence that did come in indicates that Senate Bill 7's accreditation requirements do not even satisfy any previously-articulated concept of a "minimally acceptable education." The author of today's opinion has previously construed the constitution to require "an essential level of learning by which each child in Texas is enabled to live a full and productive life in an increasingly complex world." *Edgewood III*, 826 S.W.2d at 525–26 (Cornyn, J., concurring and dissenting). At the trial of the present case, the Texas Commissioner of Education testified, in regard to Senate Bill 7, that "our present accreditation criteria at the acceptable level ... does not match up with what the real world requirements are."

But the majority shows no interest in any evidence on this issue. Nor is it concerned about input from the parties: in all of the voluminous briefing before this Court, no party makes any argument based on a "general diffusion of knowledge" requirement. On its own initiative, the majority simply seizes upon these four words; equates them with accreditation requirements; and decides that our constitution requires no more.

The consequence of this holding is obvious. Accreditation requirements may be so lax

that any school district in the state, no matter how underfunded and lacking in facilities, will meet those requirements. The poorest districts will have no practical means of improvement, because the State is now excused from providing any funding above the bare minimal level. Wealthier districts, meanwhile, will have access to enormous revenues with even the slightest marginal tax effort.

The majority's only defense against this problem places the Court in an inherently untenable role. The majority asserts that "the State's provision of a general diffusion of knowledge must reflect changing times, needs, and public expectations." 917 S.W.2d at 732 n. 14. Evidently this Court is to continually reassess the state's accreditation requirements to determine whether they are satisfactory. The Court is to make this critical determination based on its own collective wisdom, without regard to any evidence or briefing. Even the expert opinion of the Commissioner of Education will be dismissed as irrelevant.

Until recent years, the enormous complexity of the school system was thought to make efficiency a political question not suitable for judicial review. *See Kirby v. Edgewood Indep. Sch. Dist.*, 761 S.W.2d 859, 867 (Tex. App.—Austin 1988) (reversed by *Edgewood I*). Under *Edgewood I*, though, this Court was able to assess the efficiency of the school finance system by reference to a clear standard: similar access to similar revenues at similar levels of tax effort. The simplicity of this standard is what made the enforcement of article VII, section 1 justiciable.

Today's departure from the strict *Edgewood I* standard will mire the judiciary in deciding purely political questions. Even if we could speak coherently on such issues, addressing them at all is inconsistent with the proper role of the judiciary.

### III.

Senate Bill 7, as construed by the majority, plainly violates the standard set out in *Edgewood I*. Under the majority's writing, Senate Bill 7 places no meaningful cap on tax

2. The majority does not provide any page cite for this assertion, because nothing resembling it can be found in any of our previous *Edgewood* decisions.

rates. Thus, by authority of a special law adopted in 1953,[3] districts containing 37 percent of the weighted students in the state may presently impose operations and maintenance taxes of up to $2.00. Additionally, the Legislature is now free to remove the present $1.50 cap on other districts, so any district in the state will be able to tax at whatever level it chooses.

Given this reading, Senate Bill 7 does not provide districts with substantially-equal access to similar revenues per pupil at similar levels of tax effort. Because the state provides no funds at rates in excess of $1.50, every additional penny of tax effort above that level generates 28 times more in the wealthiest districts than it does in the poorest. Thus, at a $2.00 tax rate, the richest districts will enjoy $6,146 per weighted student, while the poorest can only generate $3,608 per weighted student.

The majority defends Senate Bill 7 by asserting that districts in the three lowest wealth groups will be able to provide a "general diffusion of knowledge" with a $1.31 tax rate, while districts in the three highest wealth groups must tax at approximately $1.22. 917 S.W.2d at 731 & n. 12. These figures are skewed in two important respects. First, even accepting all of the majority's assumptions, the wealthiest group of districts will actually be able to meet accreditation requirements at a rate of $1.12.[4] Thus, the majority is tolerating a *19–cent* difference—rather than a 9–cent difference—in the tax rates that rich and poor districts must levy to meet accreditation requirements.

Second, though the majority does not say so, its yield figures are based on the assumption that districts will still be maintaining their 1993 tax rates in 1996–97. The record shows that this assumption is groundless. In the five years before trial, districts raised their tax rates by an average of about 12 cents per year; and all parties agreed that

districts would continue to raise their rates to at least $1.50. The average tax rate in 1992–93 was already $1.29. Thus, we may safely assume that many districts are presently on the edge of the "equalized system," if not outside it, so the disparity in yield is undoubtedly far greater than the majority suggests.

The inescapable truth is that poor districts will now be much worse off than rich districts, even if tax rates do not go far beyond $1.50. At full implementation of Senate Bill 7, a $1.50 tax rate in the richest school districts will generate $4,421 per weighted student. That level of revenue is simply beyond the reach of the poorest school districts; even if they were to tax at a rate of $3.00, they could only generate $4,317 per weighted student.

The unfairness of this system is exacerbated by Senate Bill 7's failure to include any provisions for facilities. With operations and maintenance taxes approaching $1.50 already, there is little room left in Tier 2 for meeting facilities needs. This is not a significant problem for the wealthiest districts, since they are able to generate significant additional funds from their own tax bases by levying debt taxes. Poor districts, however, are able to generate only a small fraction of those amounts. Poor districts are thus forced to choose between funding current operations and funding capital expenditures.

The record demonstrates that this problem is as pervasive now as it was at the time of *Edgewood I.* Expert testimony established that $3 billion was needed to upgrade facilities to meet minimum standards, and that the poorer districts were in greater disarray than others. A 1992 Texas Education Agency study introduced at trial confirms this appraisal; it concludes that poor districts have older buildings, and have proportionate-

3. TEX.EDUC.CODE AUX.LAWS art. 2784g (Vernon 1995) [Act of May 14, 1953, 53rd Leg., R.S., ch. 273, 1953 Tex.Gen.Laws 710, *amended by* Act of Feb. 12, 1959, 56th Leg., R.S., ch. 7, 1959 Tex. Gen.Laws 14].

4. At trial, the State presented its evidence by individual wealth group, each including five percent of the weighted students in the state. Because the gap between the poorest and wealthiest is so dramatic, the majority extrapolates its own alternative data by averaging the figures for the three highest and lowest groups.

ly more space in portable buildings.[5] The report details the extent of the more pressing needs: for example, 281 high schools have no rooms designed to be science labs;[6] 694 campuses have no gymnasiums, and an additional 3,139 have insufficient gym space to meet their needs; 482 campuses have no libraries, and an additional 4,041 campuses have insufficient library space to meet their needs. Children, teachers, and parents in these districts might well have difficulty accepting the view that "there is no direct correlation between money and educational achievement." *Edgewood III,* 826 S.W.2d at 530 (Cornyn, J., concurring and dissenting).

Given this $3 billion need, poorer districts will not be able to carry the necessary debt service within a $1.50 tax rate. As of 1992–93, the poorest districts in the state already had debt tax rates averaging 33 cents. Testimony at trial established that a poor district would have to double or triple its rate to 66 or 99 cents to have the same level of funding for facilities as districts from average wealth on up.

Several experts testified that meeting facilities needs would impair the ability of poorer districts to provide for current operations. The district court accordingly found that a poor district that diverts Tier 2 funds from operations to facilities might be unable to meet accreditation requirements. Thus, under either the *Edgewood I* standard or the standard adopted today, this Court has the constitutional responsibility to leave the present injunction in place.

\* \* \* \* \* \*

Like another court did twenty-two years ago, the majority today leaves this state with only the hope that the Legislature will voluntarily choose to provide all children with similar educational opportunity. Unfortunately,

> in the meantime, countless children unjustifiably receive inferior educations that 'may

affect their hearts and minds in a way unlikely ever to be undone.'

*San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 71–72, 93 S.Ct. 1278, 1316, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting) (quoting *Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954)).

---

**5.** The TEA study is based on information collected in the course of the statewide school facilities inventory required by statute. *See* TEX.EDUC.CODE § 16.401. The report states that it was intended to provide "a useful basis for discussion of the costs associated with meeting the state's needs."

**6.** There was testimony at trial regarding a science teacher in Brownsville who has never had a lab to teach in, even though the State ostensibly requires that his students have a certain number of hours of lab experience.